[No. 27560-1-II. Division Two. September 13, 2002.]

THE CITY OF BURIEN, *Appellant*, v. THE CENTRAL PUGET SOUND
GROWTH MANAGEMENT HEARINGS BOARD, ET AL., *Respondents*.

376

*Michael R. Kenyon* and *Robert F. Noe* (of *Kenyon Dornay Marshall, P.L.L.C.*); *John W. Hempelmann*; *Susan R. Sampson* (of *Sampson & Wilson, Inc., P.S.*); *Gary N. McLean*; and *Janet E. Garrow*, for appellant.

*Christine O. Gregoire, Attorney General,* and *Sharon S. Eckholm, Assistant*; *Donald S. Cohen* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C.*); *J. Tayloe Washburn* (of *Foster Pepper & Shefelman, P.L.L.C.*); *Traci M. Goodwin* and *Linda J.N. Strout* (of *Port of Seattle*); *Robert L. McAdams*; and *Roger A. Pearce*, for respondents.

Quinn-Brintnall, J. — The City of Burien appeals a Thurston County Superior Court judgment affirming a Central Puget Sound Growth Management Hearings Board (Board) decision upholding comprehensive plan and zoning amendments adopted by the City of SeaTac. SeaTac proposed the amendments in accordance with an interlocal agreement to settle litigation with the Port of Seattle. At issue is whether SeaTac circumvented the public participation requirements of the Growth Management Act (GMA) by entering into an interlocal agreement during negotiations that were not open to the public. The Board ruled that SeaTac complied with the GMA's public participation requirements, and Thurston County Superior Court affirmed. We likewise affirm.

## FACTS

In an attempt to settle litigation over jurisdictional matters (among other issues) regarding plans for the pro-

posed third runway at Sea-Tac Airport, the City of SeaTac and the Port of Seattle entered into an "Agreement for Confidentiality In Settlement Negotiations" in October 1996. From time to time, counsel briefed SeaTac's City Council in executive session on the status of negotiations with the Port.[1]

At its May 1997 public meeting, SeaTac's Planning Commission discussed proposed amendments to SeaTac's Comprehensive Plan (Plan). Attached to the minutes of that meeting was the Preliminary Docket for the Plan amendment, which stated that copies of the original applications for the Plan amendments were "available for public review on request." Admin. R. (Exs.) at 2615. Burien submitted an application with the following proposed amendments: the preservation of Miller Creek, cooperation between SeaTac and Burien regarding Westside residential areas, development of a greenbelt plan with trails connecting the neighboring cities, and cooperation among neighboring cities regarding surface water and drainage planning.

The Commission again addressed Plan amendments at its June 16, 1997 Planning Commission meeting. According to the minutes, SeaTac's principal planner, Craig Ward, explained at the meeting that "some of the amendments have been deferred due to the City of SeaTac and the Port of Seattle negotiations. The deferred amendments would be reviewed if the conditions for deferral are satisfied in time for final docket consideration." Admin. R. (Exs.) at 2700. The Burien planning commissioner who proposed the above amendments addressed the Commission, expressing her desire to have the amendments enacted.[2]

---

[1] *See* RCW 42.30.110(1)(i) (allowing executive session discussions with legal counsel concerning pending litigation).

[2] The minutes from the July 21, 1997 meeting read, under the heading "Public Forum (Citizens)":

Mr. Butler [Planning director] answered many questions from the Commission Members and citizens regarding the west side subarea. He acknowledged of [sic] the citizens' comments and frustrations, but also that the west side is very

SeaTac and the Port entered into an Interlocal Agreement (ILA), on September 4, 1997.[3]

Four days later SeaTac's planning director briefed the Commission on the newly executed ILA:

> Mr. Butler briefly explained to the Planning Commission that [sic] the City's and the Port's role to be able to successfully complete the ILA. The City needs to have their amendments to the comprehensive plan done by December 31, 1997, and the Port needs to implement their changes following the City.
>
> The City and the Port need to adopt a coordinated land use map by December 31, 1997, and ... this map needs to ... 1) implement[] ... the City's zoning map; 2) [be] updated to recognize the Port's Master Plan of a third runway; 3) resolve[] any discrepancies per uses of Port-owned property on the perimeter; and 4) reflect[] the City land use decisions which will affect the airport.

Admin. R. (Exs.) at 2747-48.

THE ILA

The ILA was executed by the Port and SeaTac, respectively, on August 29, 1997, and September 4, 1997, and went into effect on September 4, 1997. In pertinent part, the ILA reflects the parties' agreement to "adopt the planning, land use and zoning provisions set forth in *Exhibit A* hereto and shall implement the same." Admin. R. (Exs.) at 3903.

The Land Use Agreement in Exhibit A provides for cooperative comprehensive planning and economic development in contemplating changes to the comprehensive plan:

> 1.1 General. The Port and City shall engage in cooperative comprehensive planning to jointly address issues related to the Port's Airport properties and activities and

unique because of the Port and the City being involved in negotiations regarding the third runway.

Admin. R. (Exs.) at 2729.

[3] Recital C of this agreement explains that "[SeaTac] and Port desire to cooperate and establish a mutual and cooperative system for exercising their respective jurisdiction to avoid disputes and to resolve and dismiss existing lawsuits and SEPA appeals." Admin. R. (Exs.) at 3903.

the City's economic development, land use and related goals. The cooperative planning shall strive for consistency between the City's Comprehensive Plan and the Port's Master Plan (and related portions of the Puget Sound Regional Council's regional planning decisions). The objective is the reciprocal recognition of the Port's Master Plan (and related portions of the Puget Sound Regional Council's regional planning decisions) in the City's Comprehensive Plan and the relevant portions of the City's Comprehensive Plan in the Port's Master Plan (e.g. land use, economic development, transportation and capital facilities). The coordinated comprehensive planning activities shall include:

1.1.1 Land Uses. A land use element with appropriate Comprehensive Plan policies and land-use designations for Port properties [and related properties]. The parties shall develop a land use map displaying the results of the coordinated planning. A noise-contour overlay map will be included to foster Airport compatible land-use planning and used to guide land-use decisions within the City. Existing Part 150 noise guidelines shall be incorporated into the policies.

. . . .

1.5 Adoption and Amendment.

1.5.1 Adoption.

1.5.1.1 General. The Port adopted its Master Plan update on August 1, 1996 . . . . The third runway has been incorporated into the Metropolitan Transportation Plan adopted by the Puget Sound Regional Council. The City adopted its GMA Comprehensive Plan in December 1994 . . . .

The City Council and Port Commission respectively *shall consider adoption of updates to the City Comprehensive Plan and the Port's Master Plan to implement the coordinated planning conducted under this ¶ 1.* The Port and City may adopt appropriate portions of their coordinated planning without adoption of all elements listed under *¶ 1.1* above.

1.5.1.2 **By City**. On or before December 31, 1997, the City *shall consider* an amendment to its GMA Compre-

hensive Plan in substantially the following form . . . :

. . . .

The City's Comprehensive Plan Use Map designates a single airport land use for all properties owned or to be owned by the Port under the Port Master Plan. The development regulations, which are contained in the attached Interlocal Agreement, have two zones ("Aviation Operations" and "Aviation Commercial") within the airport land use designation. *Development of the Airport shall be done in accordance with the Interlocal Agreement and shall control in the case of any conflict with other provisions of this Comprehensive Plan. . . .*

Admin. R. (Exs.) at 3909-10 (emphasis added).

The parties also agreed in Exhibit A of the ILA that each

*shall adopt* a coordinated land use map that (a) *shall be implemented* by the City's zoning map; (b) is updated to recognize the Port's Master Plan (*e.g.*, third runway); (c) resolves any discrepancies on the permitted uses of Port-owned property on the perimeter of the Airport (*e.g.*, Seafirst Bank, Bai Tong Restaurant); and (d) reflects the City land use decisions that affect the Airport. *Both the City Council and the Port Commission shall adopt the coordinated land use map* on or before December 31, 1997 (and the City shall adopt it concurrently with its Comprehensive Plan Amendment).

Admin. R. (Exs.) at 3911 (emphasis added).

The Port committed to pay SeaTac $26 million dollars under the ILA's "community relief package."[4]

SeaTac enacted an ordinance (No. 97-1025) amending the Plan on December 9, 1997, and adopted zoning code and map amendments (Ordinance Nos. 98-1001 and 98-1002) on January 13, 1998.

---

[4] This total consists of $10 million for "community and land use compatibility relief and litigation settlement" (Administrative Record at 3957); $6 million first for the construction of a moving sidewalk between the Airport and the City Center/RTA station and the balance to be used at SeaTac's discretion; and $10 million to implement SeaTac's "Airport Beautification Plan."

PROCEDURAL HISTORY

Burien[5] filed a petition for review of SeaTac's Plan and zoning amendments with the Board on February 11, 1998, arguing, among many other things, that SeaTac failed to comply with the GMA public participation requirements. Burien asked the Board to review (1) SeaTac's amendment to its Plan; (2) the ILA with the Port "which Agreement is an expressly referenced and integral component of the SeaTac Plan"; and (3) the January 13, 1998 amendments to the zoning code and map. Admin. R. at 1. The Board ruled that SeaTac complied with the GMA and upheld the amendments.

The Thurston County Superior Court affirmed the Board's decision. Burien appealed directly to our Supreme Court, which transferred the case to this court.

## ANALYSIS

 We review decisions of the Board under the Administrative Procedure Act (APA), chapter 34.05 RCW, which calls for a review of the record created before the Board—not the decision of the superior court. *Buechel v. Dep't of Ecology*, 125 Wn.2d 196, 202, 884 P.2d 910 (1994). We review the Board's legal conclusions de novo, giving substantial weight to its interpretation of the statute it administers where the agency has specialized expertise in dealing with such issues. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998); *Diehl v. Mason County*, 94 Wn. App. 645, 652, 972 P.2d 543 (1999). The burden of demonstrating the invalidity of the Board's action is on the party asserting invalidity; here, that party is Burien. *See* RCW 34.05-.570(1)(a); *City of Redmond*, 136 Wn.2d at 45.

PRESUMPTION AND BURDEN OF PROOF BEFORE THE BOARD

Amendments to comprehensive plans and development regulations are presumed valid upon adoption. RCW

---

[5] The cities of Burien, Des Moines, Normandy Park, and Tukwila originally brought this action before the Board and superior court, but only Burien appealed to this court.

36.70A.320(1). The burden is on the petitioner to demonstrate that any city action is not in compliance with the GMA requirements. RCW 36.70A.320(2). When reviewing a challenge to any city action, the Board shall find compliance unless it determines that the action by the city "*is clearly erroneous* in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3) (emphasis added).

(1) Assignments of Error to Findings Abandoned Because Not Argued

 Burien assigns error to nine findings of fact. But it provides no argument supporting its challenges to these findings.[6] Therefore, we treat the Board's findings as verities. *See Stuewe v. Dep't of Revenue*, 98 Wn. App. 947, 950, 991 P.2d 634, *review denied*, 141 Wn.2d 1015 (2000).

(2) Jurisdiction of Growth Management Hearings Board

[6-8] Growth management hearings boards are charged with adjudicating GMA compliance and, when necessary, with invalidating noncompliant comprehensive plans and development regulations. RCW 36.70A.280, .302; *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 552, 14 P.3d 133 (2000). Growth management hearings boards shall hear and determine *only those petitions alleging* either

> (a) That a state agency, county, or city planning under this chapter is not in compliance with the requirements of this chapter, chapter 90.58 RCW as it relates to the adoption of shoreline master programs or amendments thereto, or chapter 43.21C RCW as it relates to plans, development regulations, or amendments, adopted under RCW 36.70A.040 or chapter 90.58 RCW; or

---

[6] Burien appears tacitly to argue that the findings of fact and conclusions of law it challenges in its assignments of error are incorrect inasmuch as they disagree or interfere with its argument on appeal. The Board cited to the record for support of each finding Burien challenges. Burien does not explain why the record, as cited by the Board, does not support the challenged findings, nor does Burien advance any other argument to support its challenges to the findings.

b) That the twenty-year growth management planning population projections adopted by the office of financial management pursuant to RCW 43.62.035 should be adjusted.

RCW 36.70A.280(1).

Through chapter 36.70A RCW, the legislature carefully limited the authority of the various growth management hearings boards. *Skagit Surveyors & Eng'rs, LLC v. Friends of Skagit County*, 135 Wn.2d 542, 565, 958 P.2d 962 (1998) (citing RCW 36.70A.280(1), .290). The GMA does not contain a requirement that it be liberally construed. *Skagit Surveyors & Engineers*, 135 Wn.2d at 565. Unless a petition alleges that a comprehensive plan or a development regulation (or amendments to either) is not in compliance with the requirements of the GMA, the Board does not have jurisdiction to hear the petition. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 178, 4 P.3d 123 (2000).

Here, the Board clarified the limits of its jurisdiction, explaining that the negotiation and execution of the ILA itself was a non-GMA action and, thus, was not subject to the Board's jurisdiction. But it ruled that "provisions of the ILA, if any, that are *included as Plan or zoning code amendments* are subject to the provisions of RCW 36.70A.140 *during the plan or zoning code amendment process.*" Admin. R. at 5403. We presume the Board meant that it could not review the ILA itself, but it could—and did—review the process by which portions of the ILA became amendments to SeaTac's comprehensive and zoning plans.

Burien claims that the Board lacked jurisdiction to conclude that the ILA "'influenced, but did not dictate, the form, substance and timing of some of the proposed Plan and zoning code amendments.'" Br. of Appellant at 12-13 (quoting Admin. R. at 5407). On the contrary, as to the ILA,

that is the one surviving issue the Board did have jurisdiction to address.[7]

Thus, the following claims are beyond the Board's jurisdiction and outside the scope of this appeal: (1) that the Port and SeaTac entered into the ILA in violation of chapter 39.34 RCW; (2) that the ILA contains an invalid payment of $26 million contingent upon SeaTac's performance;[8] (3) that the ILA cut off Burien's right to appeal;[9] (4) that SeaTac violated the appearance of fairness doctrine;[10] and

---

[7] Burien appears to have abandoned all of its issues argued below except the public participation issue and makes several arguments in support of that issue for the first time on this appeal. Its arguments almost invariably boil down to some kind of challenge to the interlocal agreement itself—not to the growth management amendments—and thus for procedural and substantive reasons the arguments were not within the jurisdiction of the Board. Most of Burien's arguments should more properly have been brought in a quo warranto action (challenging SeaTac's authority to enter into a contract with the Port that supposedly mandates amendments to the plans, thus contracting away its legislative authority to enact such changes) or in a contract action (challenging the substance of the agreement itself).

[8] Burien asks this court essentially to take judicial notice that the Port would not commit such a sum unless it was convinced it would obtain a favorable return on its investment. Even drawing the conclusion Burien urges, such a conclusion would lead to an issue that, once again, is beyond the Board's—and therefore this court's—jurisdiction in this appeal.

[9] Burien argues that the ILA cut off its right to appeal determinations made under SeaTac Municipal Code chapter 15.30, which regulates development in environmentally sensitive areas because "enforcement of that chapter is predicated on the issuance or denial of permits that [under the ILA] the Port is never required to obtain." Br. of Appellant at 33. Whatever the merits of this challenge, it relates to rights given to the Port under the ILA—not the comprehensive plan or zoning amendments. Also Burien appears to have raised this issue for the first time on appeal.

[10] The appearance of fairness statute specifically limits the application of the appearance of fairness doctrine to quasi-judicial actions and expressly excludes the legislative actions of the type involved in amending SeaTac's comprehensive and zoning plans:

Application of the appearance of fairness doctrine to local land use decisions shall be limited to the quasi-judicial actions of local decision-making bodies as defined in this section. Quasi-judicial actions of local decision-making bodies are those actions of the legislative body, planning commission, hearing examiner, zoning adjuster, board of adjustment, or boards which determine the legal rights, duties, or privileges of specific parties in a hearing or other contested case proceeding. *Quasi-judicial actions do not include the legislative actions adopting, amending, or revising comprehensive, community, or neighborhood plans or other land use planning documents or the adoption of area-wide zoning ordinances or the adoption of a zoning amendment that is of area-wide significance.*

(5) that the "Portions of the Interlocal Agreement Characterized by SeaTac and the Port as a 'Development Agreement' are Invalid Under Both the Applicable State Statute and SeaTac's Own Municipal Code and Should be Severed From the Rest of the Interlocal Agreement."[11] Br. of Appellant at 35.

The only issue properly before this court is whether the public was allowed "early and continuous" participation in the amendment process.

(3) PUBLIC PARTICIPATION UNDER THE GMA

The GMA requires each participating county and city to provide for "early and continuous public participation" in the development and amendment of its comprehensive land use plans and the development regulations implementing

---

RCW 42.36.010 (emphasis added). *See also Twin Falls v. Snohomish County*, No. 93-3-0003, 1993 WL 839715, at *58 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd., Wash. Sept. 7, 1993) (explaining "any alleged violations of the legal requirement that the hearings be fundamentally fair must be pursued through the Courts rather than this Board").

[11] Burien points out that all development agreements "shall be consistent with applicable development regulations adopted by a local government planning under chapter 36.70A RCW." Br. of Appellant at 36 (quoting RCW 36.70B.170(1)). But this argument confuses development *regulations* with development *agreements*. Unlike development *regulations*, which the Board has express jurisdiction to review under RCW 36.70A.280(1), development *agreements* are individual agreements between cities and property owners regarding the development, use, and mitigation of the development of a specific piece of property:

A local government may enter into a development agreement with a person having ownership or control of real property within its jurisdiction.... A development agreement must set forth the development standards and other provisions that shall apply to and govern and vest the development, use, and mitigation of the development of the real property for the duration specified in the agreement. A development agreement shall be consistent with applicable development regulations adopted by a local government planning under chapter 36.70A RCW.

RCW 36.70B.170(1). While "development agreements" must be consistent with the development regulations adopted under the GMA, a challenge to a development agreement does not involve the city's compliance with the GMA "but rather involves the effect of the comprehensive plan on specific land use decisions. The Board does not have jurisdiction over these types of issues ...." *Citizens for Mount Vernon v. City of Mount Vernon*, 133 Wn.2d 861, 868, 947 P.2d 1208 (1997). *See also Wenatchee Sportsmen Ass'n*, 141 Wn.2d at 179 (explaining that a "site-specific rezone is not a development regulation under the GMA, and hence ... a GMHB does not have jurisdiction to hear a petition that does not involve a comprehensive plan or development regulation under the GMA").

such plans.[12] RCW 36.70A.140. This must include broad dissemination of proposals, opportunity for written comment, public meetings after effective notice, open discussion, communication programs, information services, and consideration of and response to public comments. RCW 36.70A.140. However, inexact compliance with these procedures will not invalidate any adopted plan or amendment "if the spirit of the program and procedures is observed." RCW 36.70A.140.

◼ The Board's standard of review required it to invalidate the amendments only if it found that SeaTac's actions in adopting the plan amendments were clearly erroneous in view of the entire record before the Board and in light of the public participation requirements of the GMA. For the Board to find that SeaTac's actions were clearly erroneous, it must be "left with the firm and definite conviction that a mistake has been committed." *See Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993), *aff'd*, 511 U.S. 700, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994).

In its order, the Board explained that

---

[12] In its entirety the statute requiring public participation in the process reads as follows:

Each county and city that is required or chooses to plan under RCW 36.70A.040 shall establish and broadly disseminate to the public a public participation program identifying procedures providing for early and continuous public participation in the development and amendment of comprehensive land use plans and development regulations implementing such plans. The procedures shall provide for broad dissemination of proposals and alternatives, opportunity for written comments, public meetings after effective notice, provision for open discussion, communication programs, information services, and consideration of and response to public comments. In enacting legislation in response to the board's decision pursuant to RCW 36.70A.300 declaring part or all of a comprehensive plan or development regulation invalid, the county or city shall provide for public participation that is appropriate and effective under the circumstances presented by the board's order. Errors in exact compliance with the established program and procedures shall not render the comprehensive land use plan or development regulations invalid if the spirit of the program and procedures is observed.

RCW 36.70A.140. Virtually these same requirements are repeated under WAC 365-195-600, along with recommendations for meeting the requirements. Neither side discusses the regulation.

"while the requirement to consider public comment does not require elected officials to agree with or obey such comment, local government does have a duty to be clear and consistent in informing the public about the authority, scope and purpose of proposed planning enactments."

Admin. R. at 5403 (quoting *W. Seattle Def. Fund v. City of Seattle*, No. 94-3-0016, 1995 WL 903147, at \*51 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd., Wash. Apr. 4, 1995)).

 The GMA requires public participation, but it does not require that a city necessarily *act upon* the desires expressed by the public during that participation and comment:

However, the "public participation" that is one of the hallmarks of the GMA, does not equate to "citizens decide." The Act requires the elected legislative bodies of cities and counties, not individual citizens, to ultimately "decide" on the direction and content of policy documents such as county-wide planning policies and comprehensive plans. The Act assigns this policy making authority to city and county elected officials, who are accountable to their citizens at the ballot box.

*Twin Falls v. Snohomish County*, No. 93-3-0003, 1993 WL 839715, at \*55 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd., Wash. Sept. 7, 1993) (quoting *Poulsbo v. Kitsap County*, No. 92-3-0009, 1993 WL 839713, at \*26 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd., Wash., Apr. 6, 1993)).[13]

(4) PROPER FORUM

 The Board properly ruled that the ILA was not executed under the GMA and, by its terms, it did not amend

---

[13] In its reply brief, Burien claims that SeaTac contracted away its legislative authority under the GMA to enact amendments to its plans. Such an action would be illegal because "'[u]nless authorized by statute or charter, a municipal corporation, in its public character as an agent of the state, cannot surrender, by contract or otherwise, any of its legislative and governmental functions and powers, including a partial surrender of such powers.'" *See Nollette v. Christianson*, 115 Wn.2d 594, 608-09, 800 P.2d 359 (1990) (quoting 2 EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 10.38 (3d rev. ed. 1988)).

Burien's "contracting away" challenge is a more fitting challenge for a quo warranto proceeding under chapter 7.56 RCW. But the Board lacked jurisdiction to hear such a challenge; therefore, Burien's argument that SeaTac improperly contracted away its legislative authority is not properly before us for review.

SeaTac's plan or regulations: "[T]he negotiation and execution of the ILA itself, a non-GMA action, is not subject to the public participation requirements of the GMA over which the Board has jurisdiction." Admin. R. at 5403.

We agree that the Board lacked jurisdiction to review the interlocal agreement and affirm.

HUNT, C.J., and ARMSTRONG, J., concur.