123 P.3d 102 (2005)
155 Wash.2d 824
FERRY COUNTY, Petitioner,
v.
CONCERNED FRIENDS OF FERRY COUNTY and Eastern Washington Growth Management Hearings Board, Respondents.
No. 75493-4.
Supreme Court of Washington.
November 17, 2005.
*103 Stephen Thomas Graham, Attorney at Law, Republic, for Petitioner/Appellant.
Michael David Pierson, Megan Ellen McCloskey, Riddell Williams PS, Seattle, Martha Patricia Lantz, Attorney General's Office, Lic & Admin Law Div, Olympia, Megan Ellen McCloskey, Rafel Manville PLLC, Seattle, for Appellee/Respondent.
Sheila Deirdre Lynch, Alan D. Copsey, Thomas J. Young, Attorney General's Office, Olympia, for Amicus Curiae Washington Department of Community Trade and Economic Development, Washington Department of Fish and Wildlife and Washington State Department of Ecology.
En Banc.
FAIRHURST, J.
¶ 1 The Eastern Washington Growth Management Hearings Board (Board) found Ferry County noncompliant with the Growth Management Act (GMA), chapter 36.70A RCW. Specifically, the Board found that Ferry County failed to demonstrate inclusion of best available science (BAS) in listing only two species as endangered, threatened, or sensitive (ETS) in its critical areas ordinance. We hold that substantial evidence supports the Board's finding and affirm the Court of Appeals.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 2 In an order dated July 31, 1998, the Board found that Ferry County failed to include BAS in adopting its second amended comprehensive plan and that it was, therefore, not in compliance with the GMA, specifically RCW 36.70A.172. Concerned Friends of Ferry County v. Ferry County, No. 97-1-0018, 1998 WL 498783, at **2-3 (E. Wash. Growth Mgmt. Hr'gs Bd. July 31, 1998).
¶ 3 On December 7, 1998, Ferry County adopted amendments to its second amended comprehensive plan. Administrative Record (AR) at 2, 571-72. The December 7, 1998 version listed only four ETS species in its designation of critical areas  the bald eagle, ferruginous hawk, peregrine falcon, and lynx. AR at 51-52, 586.
¶ 4 Kevin Robinette, a habitat biologist with the Washington Department of Fish and Wildlife (DFW), contacted the Washington Department of Community, Trade, and Economic Development (DCTED) by letter on December 16, 1998 and carbon copied other parties. AR at 604-05. Robinette informed DCTED that Ferry County's amended comprehensive plan was still weak in several areas. AR at 604. Relevant here, he opined that Ferry County's list of ETS species was incomplete, omitting at least the bull trout. AR at 605.
¶ 5 In a subsequent compliance hearing order issued on September 30, 1999, the Board found that "[t]he record provides no evidence that Ferry County considered `best available science' in designating fish and wildlife habitat conservation areas and identification of priority habitats and species." AR at 2. The Board further reasoned that the county had
not provided sufficient evidence that BAS was considered or included in its designation of priority species or habitat areas for priority species. The County provides no rationale for excluding species designated by DFW except vague references to Constitutional authority and "local legislative authority's discretion". The Board finds that Petitioners have met their burden of proof that Ferry County acted erroneously in the designation of priority species and habitat areas.
AR at 4.
¶ 6 Ferry County again amended its comprehensive plan on February 28, 2000. AR at 245, 613-14. The February 28, 2000 version of the comprehensive plan listed only two ETS species  the bald eagle and lynx. AR at 136-37, 622.
¶ 7 The February 28, 2000 version of the plan, like the December 7, 1998 version, rejected DFW's priority habitat species (PHS) list[1] and departed from the DFW's suggested *104 listing[2] of 12 ETS species for Ferry County. AR at 246; Tr. of Mar. 27, 2000 Compliance Proceeding at 3.[3] Furthermore, Ferry County's new list was contrary to evidence that both the bull trout and peregrine falcon were present in Ferry County. The evidence is that there is a bull trout recovery area in Ferry County and the Confederated Tribes of the Colville Reservation (hereinafter Colville Tribe) manages peregrine falcons as part of its game bird populations.[4]See AR at 33, 216-17, 239, 254-55, 605.
¶ 8 Ferry County decided to list only the bald eagle and the lynx as ETS in its February 28, 2000 amended comprehensive plan based on recommendations contained in two letters from retired Alaska Department of Fish and Game wildlife planner, Dr. Donald McKnight. Dr. McKnight concluded that the caribou, grizzly bear, timber wolves, pygmy rabbit, ferruginous hawk, peregrine falcon, sandhill crane, upland sandpiper, and the American white pelican did not require consideration as ETS species in Ferry County; only the bald eagle and the lynx required consideration as ETS. AR at 223-26. In making his conclusions, Dr. McKnight consulted a book on bird breeding locations published in 1997, considered "various other field guides and wildlife texts," and talked to Dana Base, a DFW wildlife biologist for Ferry County, regarding distribution of pygmy rabbits.[5] AR at 223-26.
*105 ¶ 9 DFW biologist Robinette contacted the Ferry County Planning Department by letter on February 17, 2000. AR at 71-72. Robinette informed Ferry County of his disappointment by Ferry County's decision not to use DFW's PHS list for designating fish and wildlife habitat conservation areas. AR at 71. Additionally, he informed Ferry County that even if it chose to protect only habitat of ETS species, it had incorrectly omitted the bull trout from its list, pointing out that portions of Ferry County were within the bull trout recovery area. AR at 71-72.
¶ 10 In its second order on compliance issued on May 23, 2000, the Board reasoned that Ferry County could choose "not [to] adopt the DFW recommendation, as long as that decision is based on a sound, reasoned process which includes best available science." AR at 254. However, the Board concluded that Ferry County's species listing was not based on BAS:
The County has consulted with a credentialed biologist, but the process he undertook to develop his recommendations is inadequate. There is no evidence in the record that that [sic] the consultant coordinated his recommendation with any other scientists with expertise in Ferry County, such as the Colville [T]ribe, U.S. Forest Service, or the DFW. There is no evidence that any on-site field observations were conducted. With specific reference to the Peregrine Falcon, his recommendation seems to conflict with activities of the Colville Tribe. Regarding Bull Trout, a sensitive species documented to exist in Ferry County, he makes no mention at all.

. . . .
The Board determines the County has not provided a scientific foundation, evidence of analysis, or a reasoned process to justify their listing, while rejecting the recommendations of endangered, threatened and sensitive species and wildlife habitat conservation areas provided by DFW. Such action was a mistake and is clearly erroneous.
... Ferry County is not in compliance with RCW 36.70A.172 regarding protection of wildlife habitat.
AR at 254-55 (emphasis added).
¶ 11 Ferry County sought judicial review of the Board's decision under the Administrative Procedure Act (APA), chapter 34.05 RCW. The county argued that the Board's decision was not supported by sufficient evidence and that the Board had taken part in improper ex parte contacts with state employees. The superior court found that the county had failed to show any prejudice caused by the ex parte contacts and affirmed the Board's second compliance order. In doing so, the trial judge reasoned:
The best available science means more than simply submitting the opinion of some person to a decision maker, in this instance the Board of County Commissioners.... Under no circumstances can it be argued here that the County has submitted any information that would rise to the level of best available science.
. . . .
And the process that was presented to the Board here is simply a two-page summary letter, two letters by a person identified as a wildlife biologist which justified the County's decision to move away from the science they had previously adopted in their interim critical area ordinances and in the first go rounds of the comprehensive plan, and the basis for that change was in no way explained by the conclusory statements of the biologist that was hired by the County.
I understand ... the problems of small counties and small towns in meeting this requirement of process. There is no[t] $50,000 that can be allocated to prepare a study. But that doesn't mean that the County is without any responsibility at all to show not only to the Growth Management Hearings Board but to its citizens that it is complying with the law in considering best available science.
Verbatim Report of Proceedings at 8, 10-11.
¶ 12 In a published opinion,[6] the Court of Appeals also affirmed, holding that substantial *106 evidence supported the Board's finding that Ferry County erred in not basing its species listing on BAS. Ferry County v. Concerned Friends of Ferry County, 121 Wash. App. 850, 857, 90 P.3d 698 (2004). We granted review on only "whether substantial evidence supports the Board's finding that the County did not base its species listing on the best available science." Wash. State Supreme Court Order, Ferry County v. Concerned Friends of Ferry County & E. Wash. Growth Mgmt. Hearings Bd., No. 75493-4, 153 Wash.2d 1016, 106 P.3d 243 (Feb. 4, 2005).

II. ISSUE
¶ 13 Does substantial evidence support the Board's finding that Ferry County did not use BAS in listing only two species as threatened, endangered, or sensitive?

III. ANALYSIS

A. The GMA

¶ 14 The GMA directs counties and cities to designate critical areas. RCW 36.70A.170. RCW 36.70A.030(5) lists types of critical areas: (1) fish and wildlife habitat conservation areas, (2) wetlands, (3) frequently flooded areas, (4) critical aquifer recharge areas, and (5) geologically hazardous areas. Fish and wildlife habitat conservation areas are at issue here.
¶ 15 Fish and wildlife habitat conservation areas include areas where ETS species have a primary association, habitats and species of local importance, and waters of the state that provide fish and wildlife habitat.[7] WAC 365-190-080(5). Counties and cities should "classify seasonal ranges and habitat elements with which federal and state listed endangered, threatened and sensitive species have a primary association and which, if altered, may reduce the likelihood that the species will maintain and reproduce over the long term." WAC 365-190-080(5)(c)(i). Counties and cities must also determine which habitats and species are of local importance:
Counties and cities may use information prepared by the Washington department of wildlife to classify and designate locally important habitats and species. Priority habitats and priority species are being identified by the department of wildlife for all lands in Washington state. While these priorities are those of the department, they and the data on which they are based may be considered by counties and cities.
WAC 365-190-080(5)(c)(ii).
¶ 16 Counties and cities are further required to adopt development regulations that protect designated critical areas. RCW 36.70A.060. "In designating and protecting critical areas ... counties and cities shall include best available science in developing policies and development regulations to protect the functions and values of critical areas." RCW 36.70A.172(1). We address here whether Ferry County did so.

B. Standards of Review

¶ 17 The Board adjudicates compliance with the GMA and must find compliance unless a county's or city's action is clearly erroneous. RCW 36.70A.280, .320(3). The APA directs when we may grant relief from board decisions. RCW 34.05.570. On review of a board decision, we apply the standards in RCW 34.05.570 to the Board's record. Thurston County v. Cooper Point Ass'n, 148 Wash.2d 1, 7, 57 P.3d 1156 (2002); Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 76-77, 11 P.3d 726 (2000); Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 96 Wash.App. 522, 526, 979 P.2d 864 (1999).
¶ 18 The relevant provision here is RCW 34.05.570(3)(e), directing us to grant relief when the Board's order is not supported by substantial evidence. Substantial evidence is that sufficient "`to persuade a fair-minded person of the truth or correctness of the order.'" HEAL, 96 Wash.App. at 526, 979 P.2d 864 (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. *107 Hearings Bd., 136 Wash.2d 38, 46, 959 P.2d 1091 (1998) (quoting Callecod v. State Patrol, 84 Wash.App. 663, 673, 929 P.2d 510 (1997))); see also Cooper Point Ass'n, 148 Wash.2d at 8, 57 P.3d 1156.

C. Best Available Science

¶ 19 Neither RCW 36.70A.030 nor RCW 36.70A.172(1) defines BAS. Furthermore, few cases have analyzed BAS.[8] But, at the time of the Board's decision in May 2000, the State's growth management hearings boards had formulated considerations for determining whether BAS was included.
¶ 20 In 1996, the Western Washington Growth Management Hearings Board recognized that the legislature had not defined BAS and, therefore, sought to determine for itself the scope and meaning of the term. Clark County Natural Res. Council v. Clark County, No. 96-2-0017, 1996 WL 716195, at *5 (W. Wash. Growth Mgmt. Hr'gs Bd. Dec. 6, 1996). There, the Board recognized that local governments still had discretion in making decisions within the structure of RCW 36.70A.172 and refused to establish a bright-line definition of BAS. Id. Instead, it held that it would consider claims regarding BAS on an individual basis with these factors in mind:
(1) The scientific evidence contained in the record; (2) Whether the analysis by the local decision-maker of the scientific evidence and other factors involved a reasoned process; and (3) Whether the decision made by the local government was within the parameters of the Act as directed by the provisions of RCW 36.70A.172(1).
1000 Friends of Wash. v. City of Anacortes, No. 03-2-0017, 2004 WL 586070, at *10 (W. Wash. Growth Mgmt. Hr'gs Bd. Feb. 10, 2004) (quoting the BAS parameters set forth in Clark County Natural Res. Council); Friends of Skagit County v. Skagit County, No. 96-2-0025, 1998 WL 637160, at *12 (W. Wash. Growth Mgmt. Hr'gs Bd. Sept. 16, 1998) (reasoning that the local government must provide a reasoned analysis of the range of alternatives presented by the scientific evidence in the record); Friends of Skagit County v. Skagit County, No. 96-2-0025, 1997 WL 8935, at **3-4 (W. Wash. Growth Mgmt. Hr'gs Bd. Jan. 3, 1997) (quoting the three factors established in Clark County Natural Res. Council).
¶ 21 The Eastern Washington Growth Management Hearings Board also stated that it agreed with the Western Washington board's interpretation of RCW 36.70A.172 and held that local governments must "analyze the scientific evidence and other factors in a reasoned process." Easy v. Spokane County, No. 96-1-0016, 1997 WL 191457, at *6 (E. Wash. Growth Mgmt. Hr'gs Bd. Apr. 10, 1997). Similar reasoning was evident in the Board's second order on compliance here where it held that "the County ha[d] not provided a scientific foundation, evidence of analysis, or a reasoned process to justify their listing." AR at 255. Thus, at the time of the decision here, boards at least required local governments to produce valid scientific information and consider competing scientific information and other factors through analysis constituting a reasoned process.[9]

*108 D. Application

¶ 22 Regardless of the precise definition of BAS applied, the process undertaken and the information considered by Ferry County to decide to list two species as endangered, threatened, or sensitive did not rise to the level of BAS.
¶ 23 Ferry County need not develop the scientific information through its own means, but it must rely on scientific information. Because it chose to disagree with or ignore scientific recommendations and resources provided by the state agencies and the Colville Tribe, which it could do, the county necessarily had to unilaterally develop and obtain valid scientific information.
¶ 24 Ferry County's real quarrel with the Board seems to be based on the 12 ETS species recommended by DFW  Ferry County argues that there is no evidence of species other than the lynx and bald eagle being present in Ferry County. The validity of the DFW list is largely irrelevant here; however, Ferry County could have listed whatever species it deemed appropriate if it supported its decision by BAS. Similarly, the dissent's argument that the DFW list is not supported by BAS is immaterial. We review only the Board's determination that Ferry County's listing did not include BAS, not whether listing 12 species is supported by BAS.
¶ 25 Contrary to the dissent's assertions, we do not require Ferry County to prove the absence of the additional ETS species. We are asked to answer only whether substantial evidence supports that BAS was used by Ferry County in developing its own list of ETS species. The answer is clearly no.
¶ 26 The information relied on by the county does not rise to the level of scientific information and, therefore, cannot possibly qualify as BAS. Although the dissent emphasizes Dr. McKnight's 30 years of experience working as a wildlife biologist in Alaska, nothing in Dr. McKnight's background indicates any familiarity with the wildlife of Ferry County. From his two letters, it is clear that Dr. McKnight used few to no scientific methods to obtain the species data himself and did not discuss the methods used by the sources he consulted.[10] In his discussion of the sources he consulted, Dr. McKnight cited only two sources with any specificity  a 1997 birding manual and a wildlife biologist he consulted regarding pygmy rabbits. Otherwise, Dr. McKnight merely stated that he relied "upon various field guides and big game texts for general information." Outside of consulting these limited sources, Dr. McKnight did not employ any other scientific methods, such as conducting on-site observations or conferring with other experts in the area. Although BAS does not require the use of a particular methodology, at a minimum BAS requires the use of a scientific methodology.
¶ 27 The information used to support the county's listing does not pass the smell test for BAS regardless of how it is defined. Far from rising to the level of BAS, the information obtained through Dr. McKnight's methods more greatly resembles nonscientific information, and his conclusions are more similar to speculation or surmise, which the requirement of BAS seeks to prevent. See HEAL, 96 Wash.App. at 532, 979 P.2d 864. The fact that the county's listing omits both the peregrine falcon and the bull trout, both of which are ETS species known to be present in Ferry County, further supports that the listing was not generated using BAS.
¶ 28 Furthermore, the steps taken in analyzing the information do not constitute a reasoned process. The county directs us to no evidence of it evaluating the science produced by Dr. McKnight. Nor is there sufficient *109 evidence of the county comparing science provided by Dr. McKnight to any other resources, such as science available from state or federal agencies or the Colville Tribe. As the Western Washington Growth Management Hearings Board correctly stated, a "[c]ounty cannot choose its own science over all other science and cannot use outdated science to support its choice." Island County Citizens' Growth Mgmt. Coalition v. Island County, No. 98-2-0023c, 2000 WL 268939, at *7 (W. Wash. Growth Mgmt. Hr'gs Bd. Mar. 6, 2000).
¶ 29 Although this court sympathizes with the burden placed on small or sparsely populated counties attempting to comply with the GMA, resources exist to aid such counties with compliance. RCW 36.70A.190(1) mandates that DCTED must provide "technical and financial assistance ... to counties and cities to encourage and facilitate the adoption and implementation of comprehensive plans and development regulations...." The record does not indicate whether Ferry County ever applied for state financial assistance or whether DCTED ever refused to assist Ferry County.[11]
¶ 30 Applying the substantial evidence test, a fair-minded person would most likely conclude that the Board was correct that Ferry County did not include BAS because of the extreme lack of scientific processes used by Ferry County in listing species as ETS. Therefore, the Board's decision that Ferry County failed to include BAS is supported by substantial evidence.

IV. CONCLUSION
¶ 31 Even though at the time of the Board's decision, the definition of BAS was not fully developed, it must have required more analysis than that conducted by Ferry County. Fortunately, hearings boards making similar determinations will have greater guidance in the future with the benefit of WAC 365-195-900 through -925. But here, even without that guidance, the Board's conclusion that Ferry County failed to include BAS in listing only two species as ETS is supported by substantial evidence. We affirm the Court of Appeals.
ALEXANDER, C.J., C. JOHNSON, MADSEN, BRIDGE, and OWENS, JJ., concur.

Appendix A

 RESUME
 Donald E. McKnight
 Education:
 1959 B.S. Degree Wildlife Management Wash. State U.
 1962 M.S. Degree Wildlife Ecology Wash. State U.
 1969 Ph.D. Degree Wildlife Ecology Utah State U.
 Served in U.S. Army 1962-1966
 Employment History:
 1969 Waterfowl Biologist Alaska Dept. of Fish & Game
 1970-1982 Wildlife Research Chief ADF & G
 1983-1986 Regional Wildlife Supervisor ADF & G
 1987-1989 Chief Wildlife Planner ADF & G
 Retired December 31, 1989

*110 Appendix B
P.O. Box 944
Republic, WA 99166
October 11, 1999
Mr. Stephen T. Graham
Ferry County Prosecuting Attorney
P.O. Box 633
Republic, WA 99166
Dear Mr. Graham:
This is in response to your request for information regarding the current status and distribution in Ferry County of a number of bird and mammal species, with special attention to the potential adverse effects of development in this county upon these animals and their habitats.
Most of the information on bird species was obtained from the excellent 1997 publication Breeding Birds of Washington State by M.R. Smith, P.W. Mattocks, Jr. and K.M. Cassidy, Seattle Audubon Society Publications in Zoology No. 1, Seattle, 538 pp. Lacking such a definitive and timely work on mammals, it was necessary for me to rely upon various field guides and big game texts for general information. Specific information regarding distribution of pygmy rabbits was obtained via personal communication with Mr. Dana Base, Washington Game Department wildlife biologist for Ferry County.
The sandhill crane (Grus canadensis) is not a nesting species in Ferry County at present nor are there any historical records of the species nesting here. Lesser sandhill cranes, which nest in northwestern Alaska and winter in the southern contiguous United States and Mexico, are occasionally seen along the San Poil River valley during spring and fall migrations. There is no potential for degradation or loss of critical habitat for sandhill cranes in Ferry County.
In Washington state upland sandpipers (Bartramia longicauda) are known to breed only in eastern Spokane County. The species may occasionally be seen in migration in other counties but I can find no recorded observations of the species in Ferry County. There is no potential for degradation or loss of critical habitat for upland sandpipers in this county.
The American white pelican (Pelecanus erythrorhynchos) is a very local breeder on Crescent Island in the Columbia River (Walla Walla County). Although there are summer records of nonbreeding birds in several large lakes and reservoirs in eastern Washington, these areas are only at elevations below the Ponderosa Pine zone. Ferry County has several lakes large enough to support nonbreeding pelicans, but they occur within the Ponderosa Pine zone. I can find no documentation of the occurrence of this species in the county. Thus there is no potential for adverse impacts upon its habitat in Ferry County.
The pygmy rabbit (Sylvilagus idahoensis) requires relatively undisturbed tall sagebrush habitat, and there is a narrow (1/4 to 1/2 mile wide) band of this habitat along Lake Roosevelt in the Colville Indian Reservation. I cannot, however, find any verification of the existence of this species in Ferry County. It is possible that first the Columbia River and later Lake Roosevelt formed a natural barrier limiting the distribution of pygmy rabbits to tall sagebrush habitats south and east of these bodies of water. Should future studies determine that pygmy rabbits do occur in tall sagebrush habitats within Ferry County, it is unlikely that present management practices (open livestock grazing) would have an adverse impact on the few hundred acres of their habitat in Ferry County.
Caribou (Rangifer tarandus caribou) occur in the Selkirk Mountains of extreme northeastern Washington, northern Idaho and southern British Columbia. The Selkirk herd likely numbers less than 100 animals at present and the continued existence of this herd in the United States appears very tenuous. These animals do not presently occur in Ferry County and it is very unlikely they would stray this far west in the future. Consequently there is no possibility of caribou habitat degradation in Ferry County.
The gray or timber wolf (Canis lupus) does not occur in Ferry County at present. Existence of even one pack of this large carnivore in Ferry County would require a *111 substantial prey base of large ungulates such as elk (Cervus canadensis), moose (Alces alces) or caribou. In some areas (Minnesota, for example) high densities of white-tailed deer (Odocoileus virginianus) will sustain wolf packs in the absence of competitors such as cougars (Felis concolor) which occur in Ferry County. In the case of wolves, habitat considerations must include potential depredations upon livestock and other domestic animals, and possible competition between wolves, recreational and subsistence hunters and cougars for the same prey. Any concern about the degradation of habitat for this species would be secondary to the much broader biological/political issue of transplanting the species to this county or allowing animals to remain in the area as a result of natural immigration from other areas.
I hope this information will prove useful.
Sincerely,
/s/Dr. Donald E. McKnight
Dr. Donald E. McKnight

Appendix C
P.O. Box 944
Republic, WA 99166
December 7, 1999
Mr. Stephen T. Graham
Ferry County Prosecuting Attorney
P.O. Box 633
Republic, WA 99166
Dear Mr. Graham:
This, like my letter of October 11, 1999, is in response to your request for information regarding the current status and distribution in Ferry County of a number of bird and mammal species. Special attention is given to the potential adverse effects of development in this county upon these animals and their habitats.
Most of the information on bird species was obtained from the excellent 1997 publication Breeding Birds of Washington State by M.R. Smith, P.W. Mattocks, Jr. and K.M. Cassidy, Seattle Audubon Society Publications in Zoology No. 1, Seattle, 538pp. Lacking such a definitive and timely work on mammals, it was necessary for me to rely upon various field guides and wildlife texts for general information.
The ferruginous hawk (Buteo regalis) nests in steppe vegetation zones in the southern and central Columbia Basin in Washington state. There are no published records of nesting by this species in Ferry County and consequently there is no potential for degradation or loss of critical habitat for ferruginous hawks in this county.
Two subspecies of peregrine falcons (Falco peregrinus) occur in Washington state at present, (F. p. pealei and F. p. anatum). Because F. p. pealei (Peale's peregrine falcon) is a coastal subspecies, Ferry County needs only to be concerned with F. p. anatum (Continental peregrine falcon). This subspecies was decimated throughout its range by DDT exposure and was totally eliminated from former breeding sites in eastern Washington. Following a ban on the use of DDT in North America, a pair of wild F. p. anatum has successfully nested in Klickitat County. Captive-reared young birds have been released at several other sites in eastern Washington in an attempt to augment natural reintroductions by wild birds. To date no recent nesting of peregrine falcons has been reported in Ferry County. Therefore, at present there is no potential for degradation or loss of critical habitat for peregrine falcons in this county. Because peregrine falcons nest on remote cliffs or even man-made structures such as buildings or bridges, it is possible that in the future, as populations of this species rebuild to former (pre DDT) levels, nesting will be found in Ferry County. At that time it may be necessary to take appropriate action to protect the nest site(s) from human disturbance during the critical nesting season.
The grizzly bear (Ursus arctos) was exterpated from former ranges throughout Washington, Oregon and California late in the 1800's or early 1900's. The nearest viable populations to Ferry County are in British Columbia and the Yellowstone ecosystem in the Rocky Mountains of Idaho, Montana and Wyoming. These bears are quite mobile, however, and it is possible that a single animal may pass through Ferry County *112 occasionally (this would be much more likely in the northern Cascades). As in the case of the timber wolf (Canis lupus), habitat considerations for potential reintroduction of grizzly bears in Ferry or any other county must include discussions of potentials for depredations upon livestock and other domestic animals. In addition the potential for injuries or death to humans and/or the destruction of human habitations must also be considered. At this time there is no potential for adverse impacts upon grizzly bear habitat in Ferry County.
The lynx (Lynx canadensis) is known to occur in Ferry County but very little information is available on its current abundance and distribution within the county. This is the wild cat of the northern latitudes of North America with a range that extends northward to the Brooks Range in Alaska and the Arctic Ocean in Northwest Territory, Canada. Lynx populations, not surprisingly, occur only at high elevations in the Cascade and Rocky Mountains and likely in the highest elevations of the Kettle Range of Ferry County. Virtually all potential lynx habitat in Ferry County lies within lands controlled by the U.S. Forest Service. Presently, Forest Service personnel throughout the Intermountain West and the Pacific Northwest are conducting surveys designed to delineate habitats presently occupied by lynx. Based on results of these surveys, the Forest Service will develop management plans designed to protect lynx and their habitats on all Forest Service lands nationwide. In Washington state lynx are protected from exploitation by humans through various State regulations and statutes. Ultimately lynx habitats in Ferry County will be protected by the U.S. Forest Services's rules and regulations. It does not appear that Ferry County could (or for that matter, should) impose further restrictions designed to maintain or enhance lynx habitats in the county.
I hope this information will prove useful.
Sincerely,
/s/Dr. Donald E. McKnight
Dr. Donald E. McKnight
CHAMBERS, J. (concurring).
¶ 32 I concur with the majority. I write separately to respond to the dissent. I agree that it is difficult to prove a negative. I am bemused by my learned colleague's knowledge of "[r]epeated reports of sasquatch sightings." Dissent at 113. However, I do not agree with the dissent's implication that we apply a "substantial evidence test" to determine that the "best available science" has been used by those government agencies charged with regulating growth management and making environmental assessments. Dissent at 119; cf. Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 96 Wash.App. 522, 534, 979 P.2d 864 (1999). We use the substantial evidence test to determine whether relief is appropriate, not whether the best available science was used by the county or the hearing board. RCW 34.05.570(3)(e). While the difference may seem subtle, it is a distinction that makes a difference; adopting the dissent's position would require us to consistently substitute our judgment for the county and the growth management hearings board. That is not appropriate within our system of divided government.
¶ 33 I agree with the majority, the Court of Appeals, and the Eastern Washington Growth Management Hearings Board that Ferry County failed to use the best available science in making its listing decisions. Accordingly, I concur.
J.M. JOHNSON, J. (dissenting).
¶ 34 It is notoriously difficult to prove a negative. However, under the guise of "best available science," the majority requires Ferry County to do precisely that  to prove the absence in Ferry County of several species of concern to the "environmental" groups attacking the county's local planning. The majority, and the hearings board opinion it affirms, arrives at this unrealistic burden by substituting undocumented species concerns for county decisions delegated to local discretion under the Growth Management Act (GMA), chapter 36.70A RCW.
*113 ¶ 35 The result is analogous to requiring designation of critical habitat for the sasquatch, a species which the county and its biologist expert could not prove is not present. Repeated reports of sasquatch sightings do not, in my view, constitute "best available science" nor require counties to hire expensive experts to disprove its presence. As further noted below, this case is more extreme. Unlike the sasquatch, several of these supposed endangered species have no reported sightings in Ferry County.
¶ 36 This unrealistic burden will frustrate GMA compliance for sparsely populated and financially distressed counties like Ferry County, at least so long as state agencies such as Department of Ecology (DOE) and Department of Fish and Wildlife (DFW) do not provide good faith input or assistance. I dissent.

I. FACTS
¶ 37 As part of GMA compliance proceedings, the Eastern Washington Growth Management Hearings Board (Board) by earlier order required Ferry County to amend its comprehensive plan to comply with RCW 36.70A.172 by including "best available science" in the designation and protection of fish and wildlife habitat conservation areas. See Concerned Friends of Ferry County v. Ferry County, No. 97-1-0018, 1998 WL 498783, at **2-3 (E. Wash. Growth Mgmt. Hr'gs Bd. July 31, 1998). Because of the county's very limited resources, it was fortunate to have a resident biologist expert, Dr. Donald E. McKnight, who agreed to assist the county with its good faith GMA compliance efforts.
¶ 38 Dr. McKnight has extensive credentials. He received a bachelor's degree in wildlife management and a master's degree in wildlife ecology from Washington State University, a prominent institution of higher learning geographically close to Ferry County. Administrative Record (AR) at 227. He also received a Ph.D. in wildlife ecology from Utah State University. Id.
¶ 39 In addition to his impressive education, Dr. McKnight gained 30 years of work experience with the Alaska Department of Fish and Game, which researches, manages, and protects fish and wildlife resources in our largest state notable for its abundant and varied wildlife resources. Id. Dr. McKnight held progressively responsible positions, including waterfowl biologist, wildlife research chief, regional wildlife supervisor, and chief wildlife planner. Id. He knows his wildlife.
¶ 40 Dr. McKnight was asked to give his expert opinion "regarding the current status and distribution in Ferry County of a number of bird and mammal species, with special attention to the potential adverse effects of development in [Ferry] county upon these animals and their habitats." AR at 225. The species were identified by DFW officials, by letter. That agency chose not to appear in the proceedings to directly present its concerns and expertise (which would have subjected its opinions to the test of cross-examination).
¶ 41 Dr. McKnight relied on his extensive background and expertise in wildlife, supplemented with research. In his research, Dr. McKnight also used secondary sources for some bird species,[1] as well as field guides and big game texts. He concluded that most of the species of expressed concern were not even present in the county and thus were not in need of protection under the comprehensive plan.
¶ 42 The following summarizes Dr. McKnight's several analyses and rebuttal of the challenger's claims by species:
 Sandhill crane (grus canadensis)  This species does not nest in Ferry County and there are no historical records of it doing so. Id.

 Upland sandpiper (bartramia longicauda)  This species is known to breed only in eastern Spokane County. Although they may occasionally be seen during migration in other counties, there are no recorded observations of the species in Ferry County. Id.

*114  American white pelican (pelecanus erythrorhynchos)  This species breeds almost exclusively on Crescent Island in Walla Walla County. Although there have been summer sightings in several large lakes in eastern Washington, such sightings occur only at elevations below the ponderosa pine zone. Although Ferry County has several lakes large enough to support nonbreeding pelicans, they occur only within the ponderosa pine zone. AR at 225-26.
 Pygmy rabbit (sylvilagus idahoensis)  This species requires relatively undisturbed tall sagebrush habitat. Although there is approximately one-half mile of such habitat on the Colville Indian Reservation, there have been no documented sightings. It is likely that the Columbia River and Lake Roosevelt formed a natural barrier limiting the distribution of this species to the south and east of these bodies of water. AR at 226. Dr. McKnight consulted with a local DFW wildlife biologist with respect to this species. AR at 225.
 Caribou (rangifer tarandus caribou)  This species exists only in the Selkirk Mountains of extreme northeastern Washington, northern Idaho, and southern British Columbia. The Selkirk herd numbers fewer than 100 and does not migrate as far west as Ferry County. AR at 226.
 Gray or Timber wolf (canis lupus)  There are no known sightings of this species in Ferry County. It would require a more substantial prey base of large ungulates such as elk, moose, or caribou for survival in this area. Id.

 Ferruginous Hawk (buteo regalis)  This species lives only in steppe vegetation zones in the southern and central Columbia River Basin. There are no published records or sightings of this species in Ferry County. AR at 223.
 Peregrine falcon (falco peregrinus)  This species was decimated throughout its historical range by the use of the chemical DDT (dichloro-diphenyl-trichloro-ethane). Following a ban on DDT, a nesting pair was sighted in Klickitat County. To date, no nesting of falcons has been sighted in Ferry County. Id.

 Grizzly Bear (ursus arctos)  This species was decimated throughout its historical range in Washington, Oregon, and California in the late 1800's and early 1900's. The nearest viable populations are in British Columbia and in and around Yellowstone National Park. AR at 224.
 Lynx (lynx canadensis)  Although this species is known to exist in Ferry County, it likely only exists in the highest elevations of the Kettle Range of Ferry County, areas exclusively controlled by the United States Forest Service. The forest service is currently surveying potential habitat, and Ferry County will use the information gleaned from this research for future potential designation. Id.

¶ 43 Ferry County adopted a second amended comprehensive plan based on and reflected in the scientific research provided by Dr. McKnight. Not surprisingly, that comprehensive plan did not provide for the designation and protection of the habitat for the above animals where Dr. McKnight's research conclusively demonstrated that they were not present in the county or were not in need of protection.
¶ 44 On March 27, 2000, the Board held a compliance hearing to determine if the county's new comprehensive plan amendments complied with the GMA. In an order dated May 23, 2000, the Board held that "Ferry County is found in non-compliance with the Growth Management [Act] ... for providing insufficient evidence that its failure to list all species that are endangered, threatened or sensitive is based on best available science as required by RCW 36.70A.172." AR at 256.

II. ANALYSIS

A. Substantial Evidence of Species Listing

¶ 45 The GMA was enacted in 1990 and 1991 in "response to public concerns about rapid population growth and increasing development pressures in the state, especially in the Puget Sound region." Alan D. ¶ 1 Copsey, Including Best Available Science in the Designation and Protection of Critical Areas Under the Growth Management Act, *115 23 SEATTLE U.L. REV. 97, 97 (1999). The GMA employs concepts that are designed for the densely populated and wealthy Puget Sound counties and imposes them on sparsely populated and financially distressed counties like Ferry County.[2]
¶ 46 The GMA requires that all counties and their cities comply with all its mandates if the county has (1) a population of over 50,000 and a growth rate of 10 percent during the previous 10 years or (2) a growth rate of over 20 percent in the previous 10 years regardless of population. RCW 36.70A.040(1). Counties not meeting the above criteria are permitted to "opt in" to the GMA and are courted with promised state financial assistance in meeting their compliance obligations.[3] Cumulatively, the majority of the funding went to King County (21%), Kitsap County (9.65%), Pierce County (9.4%), Snohomish County (7.2%), and Spokane County (7.15%); these five counties received 55% of the funding. Ferry County received approximately 1%, and most of Washington's smaller, poorer counties received under 2%.
¶ 47 Ferry County decided in good faith to "opt in" (a decision they have no doubt learned to regret). Some funding was provided early on but diminished to $29,915 for the 97-99 biennium, the relevant time here, and no money was received in fiscal year 2000. Tim Trohimovich, 1000 Friends of Washington, THE GROWTH MANAGEMENT ACT (GMA) AFTER MORE THAN 10 YEARS: ANOTHER LOOK & A RESPONSE TO CRITICISMS (Apr. 2002).
¶ 48 In addition to Ferry County, several other counties with limited population opted in, including Benton, Columbia, Douglas, Franklin, Garfield, Kittitas, Pacific, Pend Oreille, Stevens, and Walla Walla. Richard L. Settle & Charles G. Gavigan, The Growth Management Revolution in Washington: Past, Present, and Future, 16 U. PUGET SOUND L. REV. 867, 901 n. 217 (1993). Once under the GMA's mandates, by either law or choice, the decision of a county is irrevocable RCW 36.70A.040(1).
¶ 49 Under the GMA, all counties and cities in Washington must adopt development regulations that designate and protect critical areas, including fish and wildlife habitat conservation areas. The GMA does not define the term fish and wildlife habitat conservation areas, and the definition in WAC 365-190-080(5) was not adopted until April 15, 1991.
¶ 50 In 1995, approximately four years after enactment, the GMA was amended to clarify the standards under which counties were to designate and protect critical areas. ENGROSSED SUBSTITUTE HOUSE BILL 1724, § 105, 54th Leg., Reg. Sess. (Wash.1995); Laws of 1995, ch. 347, § 105, at 1561 (codified at RCW 36.70A.172). "In designating and protecting critical areas ... counties and cities shall include the best available science in developing policies and development regulations to protect the functions and values of critical areas." RCW 36.70A.172(1) (emphasis added). The section passed both houses of the legislature unanimously.[4]See 1995 FINAL LEGISLATIVE REPORT, 54th Leg., at 199. The GMA does not define the term best available science (BAS), and WAC 365-195-900 through -925, which further develop this concept, was not adopted until August 27, 2000. Unfortunately, the BAS requirement does not apply to state agencies.
¶ 51 In the instant case, the issue for our consideration is "`whether substantial evidence *116 supports the Board's finding that the County did not base its species listing on the best available science.'" Majority at 106 (quoting Wash. State Supreme Court Order). In order for the majority to reach the conclusion that the record is supported by substantial evidence, it must take the following untenable position:
Ferry County's real quarrel with the Board seems to be based on the 12 ETS species recommended by DFW  Ferry County argues that there is no evidence of species other than the lynx and bald eagle being present in Ferry County. The validity of the DFW list is largely irrelevant here; however; Ferry County could have listed whatever species it deemed appropriate if it supported its decision by BAS.... We review only the Board's determination that Ferry County's listing did not include BAS, not whether listing 12 species is supported by BAS.
Majority at 108.
¶ 52 A careful review of the Board's decision demonstrates that the DFW list of priority species is not only relevant but was the impetus for the Board's decision that the county did not include BAS in the development of its comprehensive plan.
¶ 53 The Administrative Procedure Act (APA), chapter 34.05 RCW, is the exclusive means of judicial review of an agency action, Diehl v. W. Wash. Growth Mgmt. Hearings Bd., 153 Wash.2d 207, 103 P.3d 193 (2004), including the growth management hearings boards. In such an appeal, we review exclusively[5] the hearing board's order and the administrative record upon which it is based. See City of Burien v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 113 Wash.App. 375, 382, 53 P.3d 1028 (2002). A review of the Board's order and the record contradicts the majority's statement that the DFW priority habitat species listing was irrelevant.
¶ 54 The Board's order repeatedly compares the actions of Ferry County to the DFW priority habitat species list. The Board made three findings of fact to support its determination that the county failed to include BAS in listing fish and wildlife species for protection. The Board's second finding of fact directly compares the DFW priority habitat species list with those protected by Ferry County under its amended comprehensive plan. That finding reads in its entirety as follows:
DFW lists the following as endangered, threatened, or sensitive species in Ferry County:

 Birds Bald Eagle Threatened
 Ferruginous Hawk Threatened
 Peregrine Falcon Endangered
 Sandhill Crane Endangered
 Upland Sandpiper Endangered
 American White Pelican Endangered
 Mammals Lynx Threatened
 Pygmy Rabbit Endangered
 Gray Wolf Endangered
 Grizzly Bear Endangered
 Woodland Caribou Endangered
 Fish Bull Trout Sensitive

Findings of Fact 2, AR at 246 (emphasis added).
¶ 55 The majority must concede that a review of the record conclusively demonstrates that not only is the Board's finding of fact that these 12 species are present in Ferry County not supported by substantial evidence, it is completely false.
¶ 56 The finding erroneously states that these species are "in Ferry County." As the majority reluctantly concedes on page 104, footnote 2, the DFW priority habit species list is actually a compilation of species that are present in the DFW's "region one." Region one includes the 10 easternmost counties of Washington, including Stevens, Pend Oreille, Lincoln, Spokane, Whitman, Walla Walla, Columbia, Garfield, and Asotin, as well as Ferry.
¶ 57 By assuming that just because a species is located in region one, which includes 10 counties, that it must necessarily be present in Ferry County, the Board and the majority are guilty of the logical error known as "fallacy of division." This syllogism falsely argues that what is true of the *117 whole must be true of each of its constituent parts. Ruggero J. Aldisert, LOGIC FOR LAWYERS: A GUIDE TO CLEAR LEGAL THINKING 222-23 (3d ed.1997).
¶ 58 Dr. McKnight's knowledge and research clearly demonstrate that the distribution of many of the species is very limited in geographical extent in eastern Washington and certainly does not extend to all 10 region one counties. For one obvious example, Dr. McKnight's research demonstrates that the upland sandpiper is known to breed only in eastern Spokane County, but not in Ferry County, in which there is no reported sighting.
¶ 59 The majority is unable to cite any available scientific information in the administrative record that demonstrates that all of the species on the DFW priority habitat species list exist in Ferry County. It is telling that the petitioners  and the DFW  chose not to present this claim or support it by actual evidence. Because the majority seems so willing to make an illogical leap, I conclude that it, like the Board, has substituted concerns for what the record actually demonstrates.
¶ 60 Further review of the Board's order demonstrates that the erroneous finding of fact 2, which states that 12 species on the DFW priority habitat species list are present "in Ferry County," is more than a mere scrivener's error. Rather, the DFW priority habitat species list formed the sole basis for determining that the county failed to use BAS in designating and protecting fish and wildlife habitat conservation areas.
¶ 61 According to the order below, the Board was responding to the following argument by Concerned Friends of Ferry County: "Fish & Wildlife Habitat Conservation Areas fails to include best available science since it rejects best available science recommendations that Washington Department of Fish and Wildlife Priority Habitat and Species Program be incorporated into Second Amended Comprehensive Plan...." AR at 251. The Board then noted that the county's comprehensive plan did not include the DFW priority habitat species plan and the Board references DFW wildlife biologist Kevin Robinette's written recommendation that 12 species be listed. The Board then concludes that "Ferry County is in non-compliance with the Growth Management [Act] ... for providing insufficient evidence that its failure to list all species that are endangered, threatened or sensitive is based on best available science as required by RCW 36.70A.171." AR at 256.
¶ 62 After carefully examining the Board's order, it is impossible to draw any conclusion other than that the DFW priority habitat species list formed the basis of the Board's decision that Ferry County failed to apply BAS. In addition to the references above, the Board stated that the county's comprehensive plan includes "only two species as Endangered Threatened Species" and referred to this as a "limited listing." In order to proclaim that the county listed "only two species" and that the listing was "limited," the Board needed some frame of reference or baseline. AR at 254-55. The baseline was the DFW priority habitat species list, which indicates that 12 such species may exist in a 10-county area in eastern Washington.[6]
¶ 63 Under the GMA, the Board is required to apply a "deferential standard of review" to the actions of local jurisdictions such as Ferry County. RCW 36.70A.3201. Moreover, local ordinances are presumed valid upon adoption, RCW 36.70A.320(1), and challenging parties bear the burden of demonstrating GMA noncompliance. RCW 36.70A.320(2).
¶ 64 Here, the statutes require that Ferry County's comprehensive plan be presumed in compliance with the GMA. The only "evidence" of the county's alleged failure to include BAS is the DFW priority habitat species list, neither presented by nor accompanied by qualified experts. Ironically, DFW input clearly does not meet the BAS as defined in the statute, in later *118 WACs, or even as defined in the majority opinion.
¶ 65 This is no science, much less best available science. At most, the list suggests that the 12 species in question may exist in the 10-county area known as "Region 1," not in Ferry County. Concerned Friends of Ferry County did not meet its burden to overturn the county. The Board's conclusion is not supported by substantial evidence, and the county must be upheld. It is decisions like this that have led to frustration state-wide with the power assumed by these unelected and nonexpert boards.[7]

B. Best Available Science

¶ 66 The majority overlooks critical errors in this record in order to discuss the definition of best available science. As demonstrated above, such analysis is unnecessary to the disposition of this case. There simply was no science to support the attack on Ferry County.
¶ 67 It is worth noting, however, what today's opinion does not do. It does not determine whether the requirement to include "best available science" is a procedural or substantive mandate. The validity of the WACs' interpreting the BAS requirement cited by the majority is not properly before us. Nonetheless, a few comments regarding BAS are necessary in order to respond to the majority.
¶ 68 The plain language employed by the GMA is not "best science" but is instead "best available science." RCW 36.70A.172. We must give meaning to all terms in the statute. As is clearly the case with Ferry County, resources may limit what is "available" for one county versus what is available for another richer or more studied county. "`Available' means not only that the evidence must be contained in the record, but also that the science must be practically and economically feasible." Copsey, supra, at 104 (emphasis added). Ferry County expressed to the Board the difficult task of including BAS in its species listing if given broad reading because the 1995 BAS amendment could "constitute mandates by the State which have not been funded by the state." AR at 256. The Board's response was that "[a] decision on that argument is not within the jurisdiction of this Board.... Devising a compliant comprehensive plan need not be an expensive process for Ferry County." Id. The Board offers no suggestion for funding and none of the "amici" state agencies offer support, financial or otherwise.
¶ 69 Today's majority criticizes the county for using only "two [secondary] sources" and for not "conducting on-site observations or conferring with other experts in the area."[8] Majority at 108-09. The state agencies attacking the county did not comply as previously indicated. This seems to suggest that the GMA imposes an impossible burden requiring Ferry County, with its limited resources, to conduct exhaustive on-site surveys to prove a negative, the nonexistence of several species. I would hold that financial resources are a relevant consideration for inquiry in determining what science is "available" under the BAS requirement.

C. The State Agencies' (Amici) Obligations Were Not Met

¶ 70 I also find improper the Board's acceptance of state agency letter comments as best available science and would correct the court's silence on this practice. The GMA is intended to be local-focused, "bottom up," rather than a "top down" planning. Here, the Board stated on several occasions that state agency letters formed its baseline for BAS determinations. "[T]he County has not provided a scientific foundation, evidence of analysis, or a reasoned process to justify their listing, while rejecting the recommendations of endangered, threatened and sensitive *119 species and wildlife habitat conservation areas provided by DFW." AR at 255.
¶ 71 A system controlled by state agencies directly conflicts with the GMA's declaration of a "broad range of discretion that may be exercised by counties and cities consistent with the requirements ... and goals of [the GMA]." RCW 36.70A.3201.
¶ 72 If state agency suggestions are per se BAS, such agencies, especially the DFW with its species expertise and statutory responsibility to protect threatened and endangered wildlife, should be required to share their site-specific science with the county. As previously noted, the agency input here clearly did not comply with BAS.
¶ 73 If the DFW priority habitat species list had been compiled using "geographic information system (GIS) technology," as the majority suggests, DFW should have provided the GIS data specific to Ferry County rather than generic information possibly relevant to the 10 counties in region one. Majority at 103-04 n. 1. It surely should have been timely data.
¶ 74 In addition, if state agency suggestions are argued as BAS, then these state agencies should become parties to hearing board actions in order to defend their BAS.[9] Here, the county made good faith efforts to include BAS in its comprehensive plan to protect fish and wildlife habitat conservation areas. Unfortunately, these good faith efforts were not reciprocated by the state agencies. Instead, three state agencies engaged in limited roles during all stages of this litigation. Neither DFW, DOE, nor Washington Department of Community, Trade, and Economic Development (CTED) participated as parties before the county.
¶ 75 At the hearings board level, state agency input was limited to several letters sent by DFW habitat biologist Kevin Robinette that disparaged the county's efforts. The letters "expressed concern" regarding Ferry County's amendments (AR at 304) and called the county's efforts "discouraging" (AR at 71) and "incomplete" (AR at 605), among others. Other letters were sent by the DOE. AR at 606-12.
¶ 76 Three assistant attorneys general filed an amici brief in this court on behalf of three different agencies: CTED, DFW, and DOE. Their brief did not advise this court that the Board's factual predicate  that the 12 species were present in Ferry County  was false. This is not what courts expect from amici, especially state agency amici. Certainly the legislature and counties expected greater and good faith efforts by state agencies to assist counties in GMA compliance.

III. CONCLUSION
¶ 77 I would reverse the Board decision as there is no substantial evidence in the record that Ferry County did not use BAS in designating and protecting wildlife habitat conservation areas. If Concerned Friends of Ferry County and the state agencies continue to maintain that the county has not included BAS in its comprehensive plan, they should bring forth such scientific evidence at the time of the county's next comprehensive plan review.
SANDERS, J., concurs.
NOTES
[1] The Fish and Wildlife Commission (Commission), which has supervising authority of DFW, has the duty to identify and classify native wildlife species that need protection or management to ensure survival in Washington. WAC 232-12-297; see also Wash. Fish and Wildlife Comm'n, http://wdfw.wa.gov/com/comintro.htm (last visited Nov. 15, 2005). The Commission classifies species that need protection as endangered, threatened, or sensitive. WAC 232-12-297.

DFW has developed lists, categorized by region, of priority species  fish and wildlife species requiring protective measures and/or management guidelines to ensure their perpetuation. AR at 119. Priority species include species designated by the State as endangered, threatened, or sensitive (state listed species); species that will be reviewed by DFW for possible listing as endangered, threatened, or sensitive (state candidate species); species or groups of animals susceptible to significant population declines within a specific area or statewide by virtue of their inclination to aggregate (vulnerable aggregations); and species of recreational, commercial, and/or tribal importance that are vulnerable. AR at 119. Those lists are called PHS lists and are the primary means used by DFW to provide fish, wildlife, and habitat information to local governments, state and federal agencies, landowners, consultants, and tribes for land use planning purposes. AR at 117. DFW produces and distributes over 4,000 copies of the PHS lists annually. AR at 118.
Although not the subject of analysis here, it is relevant to note the basis of DFW's listings  maps of known locations of priority habitats and species using geographic information system technology. AR at 117; Ex. A-28-51, No. 3 at i.
The pre-December 7, 1998 version of the comprehensive plan incorporated DFW's PHS listed species: "The Washington Department of Wildlife Priority Habitats and Species quad overlay maps will be used to identify [areas with which endangered, threatened, and sensitive species have a primary association]." AR at 286 (Ferry County Interim Ordinance 93-02, approved Mar. 8, 1993).
[2] Based on the PHS list for region one, which includes Ferry County, DFW recommended that Ferry County list 12 species as ETS: the bald eagle, ferruginous hawk, peregrine falcon, sandhill crane, upland sandpiper, American white pelican, lynx, pygmy rabbit, gray wolf, grizzly bear, woodland caribou, and bull trout. AR at 246, 253.
[3] The transcript is bound together with the administrative record but has its own tab (Tab 1). The designated numbering also starts over at 1 for the transcript.

Counsel for the county stated repeatedly that Ferry County rejected DFW's recommendations and science. See, e.g., Tr. at 11.
[O]ur scientist states that [the peregrine falcon] is not in the county and doesn't have a primary association meaning it doesn't have nesting habitat in the county. So then we say we have to balance that with what the petitioner has given us. They haven't given us anything to let us think that the Peregrine Falcon is in the county. All that Mr. Robinette states is that the Peregrine Falcon is among a whole slew of species that are in Region 1 and Ferry County is in Region 1. End of story. That is not what the law states. We have our local discretion.
Tr. at 18.
[4] Counsel for Ferry County conceded at oral argument before this court that the county was incorrect not to list the bull trout as ETS. He alluded to that possible omission earlier at the March 27, 2000 compliance hearing: "Now, there is one species that is endangered, threatened or sensitive that was not adopted by the county at this time. I can't concede that it's in the county but we are looking at it and it's the bull trout." Tr. at 13 (emphasis added).
[5] McKnight did not cite or discuss Base's research or scientific methods.
[6] The opinion was originally unpublished. See Ferry County v. Concerned Friends of Ferry County, noted at 121 Wash.App. 1004, 2004 Wash. App. LEXIS 1597, 2004 WL 792113 (2004).
[7] This list does not include all of the fish and wildlife habitat conservation areas mentioned in WAC 365-190-080(5).
[8] Division One of the Court of Appeals undertook the most detailed analysis of the BAS standard in HEAL but did not address its definition specifically. The court considered primarily whether the BAS requirement was purely procedural and held that "evidence of the best available science must be included in the record and must be considered substantively in the development of critical areas policies and regulations." HEAL, 96 Wash.App. at 532, 979 P.2d 864. The opinion did not define what was required to fulfill BAS but implied that it was intended to facilitate adoption of regulations not based on "speculation or surmise." Id.; see also Whidbey Envtl. Action Network v. Island County, 122 Wash.App. 156, 171, 93 P.3d 885 (2004).
[9] Furthermore, in August 2000, DCTED adopted criteria for complying with the BAS requirement under authority granted by the legislature to adopt rules to assist counties and cities in adopting comprehensive plans and development regulations. RCW 36.70A.190(4)(b); WAC 365-195-900 through -925. To inform those regulations, in September 1998, DCTED convened a technical team to analyze the RCW 36.70A.172(1) BAS requirement. Alan D. Copsey, Including Best Available Science in the Designation and Protection of Critical Areas Under the Growth Management Act, 23 SEATTLE U.L. REV. 97, 102 (1999). The team's recommendations strongly influenced the regulations adopted.

WAC 365-195-905 first describes criteria for determining BAS. WAC 365-195-910 then describes criteria for obtaining BAS. WAC 365-195-915 next outlines criteria for including BAS in developing policies and development regulations.
Although WAC 365-195-900 through -925 were not in place at the time of the Board's decision here, the Board made inquiries similar to the considerations now recommended by WAC 365-195-900 through -925, requiring valid scientific information to be analyzed in a reasoned process.
[10] Dr. McKnight's resume and letters of October 11, 1999 and December 7, 1999 are attached to this opinion as appendices A, B, and C, respectively. Dr. McKnight's two letters constitute the entirety of Ferry County's research into the presence of ETS species in Ferry County.
[11] Based on an outside report, not part of the record and not argued by the parties, the dissent maintains that the State failed to provide adequate financial assistance to Ferry County. Dissent at 115. However, the outside report on which the dissent relies indicates that Ferry County received a total of $572,554 in GMA planning grants between 1991 and 2003. TIM TROHIMOVICH, 1000 FRIENDS OF WASHINGTON, THE GROWTH MANAGEMENT ACT (GMA) AFTER MORE THAN 10 YEARS: ANOTHER LOOK & A RESPONSE TO CRITICISMS (Apr. 2002), http://www.futurewise.org/ resources/resources/GMA_another_look.pdf. The report reflects that the State has, pursuant to RCW 36.70A.190(3), developed and administered "a grant program to provide direct financial assistance to counties and cities for the preparation of comprehensive plans under this chapter." The dissent does not discuss and the record does not indicate the amount of assistance required by Ferry County or whether Ferry County even sought assistance.
[1] Sources included well known and respected sources, e.g., MICHAEL R. SMITH, PHILIP W. MATTOCKS, JR. & KELLY M. CASSIDY, BREEDING BIRDS OF WASHINGTON STATE (1997).
[2] Ferry County's population is 7,300. Of Washington State's 39 counties, Ferry County ranks (1) last in population density at 3.3 persons per square mile, (2) last in per capita annual personal income at $17,437, and (3) first in the receipt of food stamps and medical assistance. See Office of Financial Management, 2003 WASHINGTON STATE DATA BOOK 194-95. In contrast, King County's population is 1,779,300 (approximately 243 times greater than Ferry County), and contains at least 24 cities with greater populations than all of Ferry County. Id. at 208-09.
[3] Direct funding was administered through amicus Washington Department of Community, Trade, and Economic Development. The record here shows no support of any kind from amici DFW and DOE to Ferry County.
[4] It is highly doubtful that this legislation would have received such unanimous support if it had been known that the best available science requirement would be interpreted to be as onerous as it is rendered by the majority opinion.
[5] The majority opinion expends considerable resources detailing hearings board decisions issued prior to the order that is the subject of the instant appeal, as well as subsequent appeals to the superior court and Court of Appeals. These are entirely irrelevant for purposes of this administrative appeal.
[6] Neither DFW nor any representative presented evidence or testified as to these species before the county or Board, notwithstanding that department's statutory obligations to threatened and endangered species, e.g., RCW 77.12.020(5), (6).
[7] This case does not present a constitutional challenge to the boards or their makeup and procedures.
[8] If the use of secondary sources less than two years old is a requirement for GMA compliance, it is doubtful than any county in the state could meet the requirement. King County's most recent critical areas ordinance, for example, relies on secondary resources that are more than two years old. See King County, BEST AVAILABLE SCIENCE REFERENCES, EXECUTIVE REPORT (Feb. 2004), http://www.metrokc.gov/ddes/cao/PDFs04ExecProp/BAS-Literature Refs04.pdf.
[9] As previously noted, the DFW list here would not survive cross-examination.