274 P.3d 1040 (2012)
166 Wash.App. 172
OLYMPIC STEWARDSHIP FOUNDATION, Appellant,
v.
WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD, Respondent.
No. 40272-6-II.
Court of Appeals of Washington, Division 2.
January 26, 2012.
*1041 Brian Trevor Hodges, Pacific Legal Foundation, Bellevue, WA, for Appellant.
Marc Worthy, Office of the Attorney General, Mark Robert Johnsen, Attorney at Law, Seattle, WA, for Respondent.
PENOYAR, C.J.
¶ 1 Rivers alter their course over time, a process known as "channel migration." In 2009, Jefferson County (County) enacted a critical areas regulation requiring property owners to retain all vegetation located in "high-risk" channel migration zones (CMZs)[1] for five of the County's rivers. The regulation defined "high-risk CMZs" as those portions of the five rivers' channels that are "likely to migrate" during the next 50 years. In this appeal, Olympic Stewardship Foundation (Foundation) challenges the vegetation regulation, arguing that it violates (1) the Growth Management Act's (GMA) "best available science" requirement, RCW 36.70A.172(1); and (2) RCW 82.02.020's "constitutional nexus and rough proportionality" requirements. Additionally, the Foundation asserts that (3) the legislature's 2010 amendment to RCW 36.70A.480 invalidates the County's nonconforming use regulation for critical areas. We reject the Foundation's arguments and affirm the Western Washington Growth Management Hearings Board's (Board) final decision and order and its subsequent compliance order.

FACTS
¶ 2 The GMA, chapter 36.70A RCW,[2] requires participating counties to designate critical areas "where appropriate" and to adopt development regulations to protect these areas. RCW 36.70A.170(1)(d); RCW 36.70A.060(2). "Critical areas" include "geologically hazardous areas," which are defined as "areas that because of their susceptibility to erosion, sliding, earthquake, or other geological events, are not suited to the sitting of commercial, residential, or industrial development consistent with public health or safety concerns." RCW 36.70A.030(5)(e), (9). Counties must "include the best available science" when they designate critical areas or develop policies and development regulations *1042 to protect critical areas. RCW 36.70A.172(1).

I. 2008 Ordinance
¶ 3 On March 17, 2008, the Jefferson County Board of County Commissioners (BOCC) adopted critical areas ordinance 03-0317-08 (2008 ordinance), which added former chapter 18.22 (2008) to the Jefferson County Code (JCC). See Ordinance 03-0317-08, at 1, 16, 18, Ex. C. 1-42. Article V of former chapter 18.22 JCC designated "geologically hazardous areas" in the County and adopted protection standards for these areas. Former JCC 18.22.160, .170 (2008).
¶ 4 Significantly, former JCC 18.22.160(2)(d) designated CMZs as a type of "geologically hazardous area" subject to article V's protection standards. The development regulations noted that CMZs are "subject to risk due to stream bank destabilization, rapid stream incision, stream bank erosion and shifts in the location of stream channels." Former JCC 18.10.030 (2008).
¶ 5 Besides designating CMZs as "geologically hazardous areas," former chapter 18.22 JCC defined CMZs to include three distinct components: "the present channel, the severe channel migration hazard area and the moderate channel migration hazard area." Former JCC 18.10.030. Another subsection defined a "high risk CMZ area"a designation that the BOCC may have intended as a synonym for "severe channel migration hazard area"as an area where "channel migration is likely within the next 100 years." Former JCC 18.22.160(2)(d). Most importantly, for purposes of this appeal, article V's protection standards imposed the following "vegetation retention" requirements on any future project involving a parcel that contained a CMZ:
(1) General. Application for a project on a parcel of real property containing a designated geologically hazardous area or its buffer shall adhere to the requirements set forth below.
. . . .
(4) Vegetation Retention. The following provisions regarding vegetation retention shall apply:
(a) During clearing for roadways and utilities, all trees and understory lying outside of approved construction limits shall be retained; provided, that understory damaged during approved clearing operations may be pruned.
(b) Damage to vegetation retained during initial clearing activities shall be minimized by directional felling of trees to avoid critical areas and vegetation to be retained.
(c) Retained trees, understory and stumps may subsequently be cleared only if such clearing is necessary to complete the proposal involved in the triggering application.
Former JCC 18.22.170.

A. County's Consideration of "Best Available Science"
¶ 6 The BOCC included findings in the 2008 ordinance that addressed the GMA's "best available science" requirement:
81. . . . Classification and/or designation of certain regions of the county as a particular type of critical area is, in many cases, based on information disseminated by others. . . . These citations to outside sources used to determine where critical areas are located within the County are hereby incorporated by reference as Best Available Science.
82. As part of the 2004 [comprehensive plan] update process, County staff and consultants reviewed current Best Available Science and received a report entitled: Christensen, D.2004.[[3]] Review of Best Available Science for 2004 Comprehensive Plan and Development Regulations Update. September 22, 2004.
. . . .
89. Jefferson County Natural Resources Division and Jefferson County Department of Community Development receive report Perkins, S.J. 2006. Final Report. Channel Migration Hazard Maps for the Dosewallips, *1043 Duckabush, Big Quilcene, and Little Quilcene Rivers, Jefferson County, Washington. Perkins Geosciences, in February, 2006.
90. USDI Bureau of Reclamation September, 2004 Channel Migration Zone Study Jefferson County, Washington[,] Duckabush, Dosewallips, Big Quilcene and Little Quilcene Rivers. Technical Service Center Flood Hydrology Group D-8530 Denver, Colorado, provides channel migration zone information.
91. A Framework for Delineating Channel Migration Zones, Washington State Department of Ecology, Washington State Department of Transportation, November, 2003. Ecology Final Draft Publication #XX-XX-XXX, provides channel migration zone information.
Ordinance 03-0317-08, at 9-10. The ordinance stated that the Planning Commission, Department of Community Development, and the BOCC had considered and evaluated the scientific literature that the BOCC included in an attached 24-page bibliography and that the BOCC had developed the regulations in former chapter 18.22 JCC by synthesizing this scientific literature. Ordinance 03-0317-08, at 17.

B. The Foundation's Challenge to the 2008 Ordinance
¶ 7 On May 23, 2008, the Foundation, a nonprofit corporation, and seven of its members,[4] challenged the 2008 ordinance by filing a petition for review with the Board. All seven members named in the petition reside in the County, but the administrative record apparently does not include any information about whether these members own property that is affected by the County's vegetation regulation.
¶ 8 The Foundation raised 10 issues in its prehearing brief to the Board, but only 2 are relevant in this appeal:
6. Did Jefferson County fail to comply with RCW 36.70A.172(1) [the GMA's "best available science" provision] when it adopted JCC 18.22.170(4) by imposing vegetation retention standards on all development in a "channel migration zone?"
. . . .
10. Did Jefferson County fail to comply with RCW 36.70A.172(1) and RCW 36.70A.370,[5] and fail to consider and balance planning goal 6 (RCW 36.70A.020(6) (property rights)) in adopting JCC 18.22.160-.180, which changes existing development and uses into nonconforming uses?
1 Administrative Record (AR) at 158.[6] The Foundation also suggested in its prehearing brief that because the "best available science" did not support the vegetation regulations, these regulations did not comply with "constitutional nexus and rough proportionality requirements." 1 AR at 169.
¶ 9 Both parties attached numerous exhibits to their prehearing briefs, including the scientific studies that the BOCC cited in findings 82, 89, 90, and 91 of the ordinance. The parties also attached the following scientific information:
 1 AR at 206-18 ("Channel Migration Zones," a chapter from King County's Best Available Science, Volume 1 (Feb. 2004));
 1 AR at 365-458 ("Lower Hoh River Channel Migration Study," by Perkins Geosciences (June 2004));
 1 AR at 627-635 ("Geology, geomorphology, and the restoration ecology of salmon," by David R. Montgomery, University of Washington (Nov. 2004));
 1 AR at 637-71 ("Channel Migration Hazard Maps for Eastern Jefferson County Rivers" by Susan Perkins, Perkins Geosciences (2004)); and

*1044  1 AR at 705-708 ("Management Recommendations for Washington's Priority Habitats: Riparian," Washington Department of Fish and Wildlife (DFW web page)).

C. Board's Final Decision and Order
¶ 10 On November 19, 2008, the Board issued a final decision and order rejecting the majority of the Foundation's claims. With regard to issue six, the Foundation's "best available science" challenge, the Board noted that the County had relied on the studies listed in the 24-page bibliography attached to the ordinanceincluding the Bureau of Reclamation's CMZ study, the Department of Ecology's CMZ delineation study, and Perkins Geosciences's 2006 CMZ hazard mapsas the "best available science" to develop the critical areas regulations. The Board noted that in its interpretation, the Foundation was not arguing that these scientific studies did not constitute the "best available science" but, rather, that these studies did not support the adopted vegetation regulation.
¶ 11 The Board partly agreed with the Foundation on issue six, noting that although the Department of Ecology's study (publication 03-06-027) and Perkins Geosciences's "Lower Hoh River Channel Migration Study" addressed the importance of vegetation in the river environment, the "best available science" did not support former JCC 18.22.170(4)'s blanket restriction on vegetation removal throughout the entirety of the designated CMZs. The Board also expressed concern that the regulation could be interpreted to prohibit vegetation removal on an entire parcel of property even if only a portion of that parcel fell within a CMZ. In the Board's view, the County should have limited vegetation removal only to the high-risk portions of CMZs:
The importance of vegetation in the fluvial environment has been well documented, especially in regards to its significant role in erosion control, bank stabilization, bank protection, and bank accretion.[7] Vegetation is also important as it serves to provide the recruitment of large woody debris (LWD) which can prevent bank erosion and serves to direct how and where a channel may migrate.[8] However, [former JCC 18.22.170(4)] appears to limit the removal of vegetation on the entirety of property containing a designated [geologically hazardous area] or its buffer. For a CMZ this would be an area of varying width and risk assessment. Although it is hard to ascertain from the Record presented to the Board, this area may range in size from a hundred feet to thousands of feet.
Of concern to the Board is Jefferson County's apparent requirement to retain vegetation regardless of the associated probability of risk which is not equal within the entire mapped CMZ, let alone on the entirety of properties only a portion of which are within a CMZ. That is, vegetation removal is not precluded only within the high risk area. Thus, should a property owner be prohibited from removing vegetation within a low risk area, or that portion of a property outside a CMZ where the probability of channel occupation is slight or nonexistent? The Board recognizes that as a river migrates it will naturally encompass areas which may currently be classified as low risk; however, this alone does not warrant a blanket restriction. Based on the scientific documentation's finding that vegetation serves an important role within what would be deemed the highest risk area of a CMZthe area within which a river may move within the 50 year periodthe County's limitation on vegetation removal as drafted is not supported by [the "best available science"].
1 AR at 825. Accordingly, the Board ordered the County to take legislative action to bring itself into compliance with the GMA.
¶ 12 The Board also rejected the Foundation's challenge with regard to issue 10, *1045 which addressed the County's nonconforming use regulation, JCC 18.22.080.[9] The Foundation had challenged the scientific basis of the nonconforming use regulation under RCW 36.70A.172(1) and had asserted that the regulation failed to comply with the planning goal of RCW 36.70A.020(6), which states, "The property rights of landowners shall be protected from arbitrary and discriminatory actions." The Board concluded that "the same scientific evidence which expounds the need to restrict development within CMZs applies to existing structures." 1 AR at 828. The Board also concluded that the County had considered private property rights during its enactment of the 2008 ordinance and that its action was not arbitrary or discriminatory.

II. 2009 ORDINANCE
¶ 13 On May 11, 2009, the BOCC adopted Ordinance 06-0511-09 (2009 ordinance) in response to the Board's order. The 2009 ordinance amended the regulations in article V of chapter 18.22 JCC in two significant ways. First, the ordinance amended the definition of "high risk CMZs" to include "those nondisconnected portions" of five Jefferson County rivers (the Big Quilcene, Little Quilcene, Dosewallips, Duckabush, and Lower Hoh) "that are likely to migrate within a 50-year time frame."[10] JCC 18.10.030. Second, the ordinance made all of article V's protection standards applicable only to "[t]hose areas within the delineated high risk CMZ area" and explicitly exempted moderately high, moderate, and low risk CMZs from the protection standards. JCC 18.22.160(2)(d). The relevant protection standard now reads:
Within a high risk CMZ, vegetation removal shall not be allowed. Vegetation removal outside of a high risk CMZ shall not be reviewed under this article. Should this provision conflict with other vegetation retention requirements specified within the JCC, the more restrictive protection requirement applies.
JCC 18.22.170(4)(d).
¶ 14 Additionally, section two of the 2009 ordinance stated that the BOCC incorporated all of the 2008 ordinance's findings of fact. Therefore, according to the BOCC, the 2009 ordinance "includes all best available Sciences literature that was submitted, considered, and evaluated by citizens, agencies, tribes, the Planning Commissioners, Department of Community Development, and the Board of County Commissioners." Ordinance 06-0511-09, at 6. The 2009 ordinance stated, "The references listed in EXHIBIT A are considered the applicable literature to *1046 address the November 19, 2008 Final Decision and Order issued by the [Board]." Ordinance 06-0511-09, at 6. Exhibit A to the 2009 ordinance included the Bureau of Reclamation study referenced in finding 90 of the 2008 ordinance, Perkins Geosciences's June 2004 "Lower Hoh River Channel Migration Study," Perkins Geosciences's February 2006 CMZ Hazard Maps, and two other studies by Perkins Geosciences that do not appear to be in the record.
¶ 15 On June 1, 2009, the County filed a statement of actions taken, which explained the above amendments to article V of chapter 18.22 JCC. The Board concluded that the County had achieved GMA compliance, stating:
[The Foundation] raises numerous objections which are beyond the scope of the County's compliance requirements. Those requirements were relatively simple: (1) address the discrepancy between the 100 year delineation of high-risk CMZs in [former] JCC 18.22.160(2)(d) and the 50-year high-risk definition in the ["best available science"], and (2) address the vegetation removal preclusion applicable to entire parcels when such a parcel includes a designated geologically hazardous area or its buffer.
The County has accomplished compliance. By adopting the Ordinance, the County . . . redefined channel migration zones and the levels of hazard risk were clarified. JCC 18.10.030 provides the needed clarity to the definition of channel migration zones or hazards. High Risk CMZs are now defined to be those areas along the described rivers, together with those non-disconnected portions of the channel, which are likely to migrate within a 50 year time frame.
The County also amended JCC 18.22.170(4)(d) so that vegetation removal is only disallowed within high risk CMZs; not on entire parcels affected by high-risk CMZs.
The Board did not, as asserted by [the Foundation], question the ["best available science"] supporting the definition of high-risk CMZs. Thus, there is no basis for [the Foundation's] assertion that the County was required to demonstrate that it analyzed the differences in the CMZ studies in regards [to] CMZ delineation. Furthermore, the lack of ["best available science"] supporting the County's "adoption of a uniform standard for delineating high risk CMZs" was not an issue on compliance.
[The Foundation's] assertion that the County's 100% vegetation requirement is not supported by ["best available science"] was raised by [the Foundation] in its Petition for Review (Issue 6). The Board addressed this issue in the [final decision and order] and concluded only that a blanket restriction on removal of vegetation that was not linked to the functions and values it was intended to protect was not supported by ["best available science"]. That blanket restriction applied to the entirety of a property containing a designated CMZ or its buffer. The Board's concern was the retention requirement's applicability regardless of the associated probability of risk, which would not be equal within the entire CMZ, let alone on the entirety of a property only a portion of which was within the CMZ. There was no question that the ["best available science"] in the record supported a vegetation removal limitation so long as it was related to the probability of risk. The County has addressed the Board's concern by limiting the requirement to high risk CMZs alone.
2 AR at 180-81 (footnotes omitted).

III. SUPERIOR COURT REVIEW
¶ 16 The Foundation sought review of both the Board's final decision and order and the Board's compliance order in Thurston County Superior Court. The superior court consolidated review and denied the Foundation's petition, concluding in relevant part that the Foundation had failed to prove that the vegetation regulation was not supported by the "best available science" or that the vegetation regulation violated RCW 82.02.020. The Foundation appealed.[11] We issued an *1047 opinion. The Foundation moved to reconsider and we withdrew our prior opinion.

ANALYSIS

I. JUDICIAL REVIEW, DEFERENCE, AND BURDEN OF PROOF IN GMA CASES
¶ 17 The Board adjudicates compliance with the GMA and must find compliance unless a county's action is clearly erroneous. See RCW 36.70A.280(1)(a), .320(3). The Board presumes the validity of development regulations and related amendments that a county adopts under the GMA. See RCW 36.70A.320(1). A county's action is clearly erroneous if the Board has a firm and definite conviction that the county made a mistake. Thurston County v. W. Wash. Growth Mgmt. Hearings Bd., 164 Wash.2d 329, 340-41, 190 P.3d 38 (2008).
¶ 18 The Administrative Procedure Act (APA), chapter 34.05 RCW, governs our review of the Board's actions. Thurston County, 164 Wash.2d at 341, 190 P.3d 38; see also RCW 36.70A.300(5). Under the APA, the party asserting the invalidity of agency action has the burden of demonstrating the invalidity. RCW 34.05.570(1)(a). The Foundation asserts that two of the APA's nine possible grounds for relief from an agency order apply here:
"(a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied; [and]
. . . .
(d) The agency has erroneously interpreted or applied the law."
See Petitioner's Br. at 8 (alterations in original) (quoting RCW 34.05.570(3)).
¶ 19 We sit in the same position as the trial court and apply the APA standards directly to the administrative record before the Board. Lewis County v. W. Wash. Growth Mgmt. Hearings Bd., 157 Wash.2d 488, 497, 139 P.3d 1096 (2006). Thus, like the Board, we defer to the county's planning action unless the action is clearly erroneous. See Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 154 Wash.2d 224, 238, 110 P.3d 1132 (2005); RCW 36.70A.320(3); see also RCW 36.70A.3201.

II. "INCLUDE THE BEST AVAILABLE SCIENCE"
¶ 20 In 1995, the legislature added the following provision to the GMA:
In designating and protecting critical areas under this chapter, counties and cities shall include the best available science in developing policies and development regulations to protect the functions and values of critical areas. In addition, counties and cities shall give special consideration to conservation or protection measures necessary to preserve or enhance anadromous fisheries.
RCW 36.70A.172(1) (emphasis added); Laws of 1995, ch. 347, § 105. As our Supreme Court has observed, the legislature did not define "best available science." Ferry County v. Concerned Friends of Ferry County, 155 Wash.2d 824, 834, 123 P.3d 102 (2005) (citing RCW 36.70A.030, .172(1)). Nor did the legislature explain what it means for a local government to "include" the "best available science."
¶ 21 In the Foundation's view, RCW 36.70A.172(1) requires a county to "create a record demonstrating that it engaged in a reasoned process of evaluating the `best available science' when it develops critical area regulations." Petitioner's Br. at 1-2. Significantly, the Foundation does not appear to argue that the scientific studies in the administrative record should not be considered the "best available science."[12] Instead, the Foundation's argument turns on the meaning of the word "include." The Foundation contends that it is not enough for local governments to merely reference relevant scientific studies during the critical *1048 areas regulatory process; rather, local governments must explain how these studies support the adopted critical areas policy or regulation. Accordingly, in this case, the Foundation argues that the Board committed an error of law under RCW 34.05.570(3)(d) by concluding that the County had complied with RCW 36.70A.172(1) without requiring the County to explain how the studies in the administrative record supported the vegetation regulation.[13]
¶ 22 The County responds that "where a GMA enactment reflects scientifically respectable conclusions, mere disagreement by a petitioner as to which studies and opinions should be relied upon is not a basis to set aside the County's judgment." Resp't's Br. at 13. The County also points to specific information in the administrative record which, the County argues, provides scientific support for the vegetation regulation. We agree with the Board's conclusion that the County complied with RCW 36.70A.172(1).

A. Standard of Review
¶ 23 The resolution of this dispute involves a question of statutory interpretation, which we review under the APA's error of law standard. RCW 34.05.570(3)(d); Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 77, 11 P.3d 726 (2000). We accord substantial weight to the Board's interpretation of a statute that it administers. Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hearings Bd., 161 Wash.2d 415, 424, 166 P.3d 1198 (2007). We do not, however, defer to an agency's interpretation of a statute if that interpretation conflicts with the statute.[14]Postema, 142 Wash.2d at 77, 11 P.3d 726.

B. Concerned Friends of Ferry County v. Ferry County

¶ 24 Our Supreme Court's most extensive discussion of what it means to "include the best available science" occurred in Concerned Friends of Ferry County. See 155 Wash.2d at 834-38, 123 P.3d 102. In that case, Ferry County listed only two species of fauna as endangered, threatened, or sensitive. Concerned Friends of Ferry County, 155 Wash.2d at 829, 123 P.3d 102. To support its action, the county relied only on the listing recommendation of a retired Alaska Department of Fish and Game wildlife planner. Concerned Friends of Ferry County, 155 Wash.2d at 829, 836-37, 123 P.3d 102. That planner, in turn, had based his listing recommendation on only a few sources: a book about bird breeding locations, "various other field guides and wildlife texts," and a conversation with a Washington Department of Fish and Wildlife biologist for Ferry County about the distribution of a single rabbit species. Concerned Friends of Ferry County, 155 Wash.2d at 829, 123 P.3d 102. By choosing to list only two species, Ferry County rejected the Department of Fish and Wildlife's suggested listing of 12 endangered, threatened, or sensitive species present in the county. Concerned Friends of Ferry County, 155 Wash.2d at 828, 123 P.3d 102. In a compliance order, the Board stated that the County had not complied with RCW 36.70A.172 by listing only two species because it did not provide "`a scientific foundation, evidence of analysis, or a reasoned process to justify their listing, while rejecting the recommendations of endangered, threatened and sensitive species and wildlife conservation areas provided by DFW.'" Concerned Friends of Ferry County, 155 Wash.2d at 830, 123 P.3d 102.
*1049 ¶ 25 Our Supreme Court agreed with the Board, holding that substantial evidence[15] supported the Board's order. Concerned Friends of Ferry County, 155 Wash.2d at 826, 838-39, 123 P.3d 102. The court noted that although the legislature had not defined what it meant to "include the best available science," the growth management hearings boards had, by the time of the Board's compliance order, "formulated considerations for determining whether [best available science] was included." Concerned Friends of Ferry County, 155 Wash.2d at 834, 123 P.3d 102. Specifically, the boards "at least required local governments to produce valid scientific information and consider competing scientific information and other factors through analysis constituting a reasoned process." Concerned Friends of Ferry County, 155 Wash.2d at 835, 123 P.3d 102.
¶ 26 Notably, our Supreme Court declined to adopt a precise definition for "best available science," concluding that Ferry County's ordinance failed to comply with this GMA requirement "[r]egardless of the precise definition of [best available science] applied." Concerned Friends of Ferry County, 155 Wash.2d at 836, 123 P.3d 102; see also 155 Wash.2d at 837, 123 P.3d 102 ("the county's listing does not pass the smell test for [best available science] regardless of how it is defined"). Apart from concluding that the wildlife planner's information did not "rise to the level of scientific information,"[16] our Supreme Court observed that the county's analysis of the wildlife planner's information did not constitute a "reasoned process":
The county directs us to no evidence of it evaluating the science produced by [the wildlife planner]. Nor is there sufficient evidence of the county's comparing science provided by [the wildlife planner] to any other resources, such as science available from state or federal agencies or the Colville Tribe.
Concerned Friends of Ferry County, 155 Wash.2d at 836, 837, 123 P.3d 102; see also Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 96 Wash.App. 522, 532, 979 P.2d 864 (1999) ("[E]vidence of the best available science must be included in the record and must be considered substantively in the development of critical areas policies and regulations." (Emphasis added).).
¶ 27 Finally, our Supreme Court also observed that the Department of Commerce[17] had adopted regulations to help local governments comply with the GMA's "best available science" requirement. Concerned Friends of Ferry County, 155 Wash.2d at 835 n. 9, 123 P.3d 102 (citing WAC 365-195-900 through -925). Although the court did not apply those regulations to Ferry County's actions because the Department of Commerce had issued the regulations after the Board's compliance order in that case, the court observed that "the Board made inquiries similar to the considerations now recommended by WAC 365-195-900 through -925, requiring valid scientific information to be analyzed in a reasoned process." Concerned Friends of Ferry County, 155 Wash.2d at 835 n. 9, 123 P.3d 102. The court noted, "Fortunately, hearings boards making similar determinations will have greater guidance in the future with the benefit of WAC 365-195-900 through -925." Concerned Friends of Ferry County, 155 Wash.2d at 838-39, 123 P.3d 102.

C. The County Complied with the GMA's "Best Available Science" Requirement
¶ 28 As in Concerned Friends of Ferry County, the question here is whether the *1050 County "include[d] the best available science" under RCW 36.70A.172(1) when it enacted the challenged regulation. This case presents us with a situation in which the County identified numerous scientific studies that it relied on in adopting the vegetation regulation but did not explicitly analyze on the record how these studies supported its decision to prohibit vegetation removal in high-risk CMZs adjacent to five county rivers. We agree with the Board that the County complied with RCW 36.70A.172(1)'s "best available science" requirement.
¶ 29 We must first determine what it means to "include the best available science." Because we defer to an agency's interpretation of a statute that it administers, we turn to the relevant Department of Commerce[18] regulations, which our Supreme Court identified in Concerned Friends of Ferry County. See 155 Wash.2d at 835 n. 9, 838-39, 123 P.3d 102; WAC 365-195-900 through -925. The Foundation does not cite or discuss these regulations, and the County mentions them only in passing. Nevertheless, as the Concerned Friends of Ferry County court recognized, these regulations are the proper starting point for determining whether a county has complied with RCW 36.70A.172(1)'s "best available science" requirement. See 155 Wash.2d at 835 n. 9, 838-39, 123 P.3d 102.
¶ 30 The Department of Commerce promulgated these regulations in 2000 to "assist counties and cities in identifying and including the best available science in newly adopted policies and regulations . . . and in demonstrating they have met their statutory obligations under RCW 36.70A.172(1)." WAC 365-195-900(2). Most relevant here, WAC 365-195-915 includes criteria to assist counties in demonstrating that they have "included the best available science" in developing critical areas policies and regulations. Counties "should address each of the following on the record":
(a) The specific policies and development regulations adopted to protect the functions and values of the critical areas at issue.
(b) The relevant sources of best available scientific information included in the decision-making.
(c) Any nonscientific informationincluding legal, social, cultural, economic, and political informationused as a basis for critical area policies and regulations that depart from recommendations derived from the best available science.
WAC 365-195-915(1).
¶ 31 We agree with the Board that the County addressed "[t]he relevant sources of best available scientific information included in the decision-making" on the record, as WAC 365-195-915(1)(b) requires. As the Board observed, the BOCC's 2008 ordinance specifically identified a 24-page bibliography of scientific literature that the BOCC evaluated in order to develop the critical areas regulations. See Ordinance 03-0317-08, at 17, Ex. A. Additionally, the findings in the 2008 ordinance singled out detailed studies and reports by the Department of Ecology, the Bureau of Reclamation, Perkins Geosciences, and a former manager of the County's natural resources division. Ordinance 03-0317-08, at 9-10. The 2009 ordinance incorporated these findings and cited additional studies and maps by Perkins Geosciences as the scientific basis for addressing the Board's final decision and order. Finally, as the Board recognized, these studies and reports discuss, in part, the specific value at issue here: the importance of vegetation in the river environment "especially in regards to its significant role in erosion control, bank stabilization, bank protection, and bank accretion." 1 AR at 825.
¶ 32 We do not read Concerned Friends of Ferry County as imposing a duty on a county to describe each step of the deliberative process that links the science that it considers to the adopted policy or regulation. Nor does the relevant Department of Commerce regulation impose such a dutyrather, it requires *1051 that counties "address . . . on the record . . . [t]he relevant sources of best available scientific information included in the decision-making." WAC 365-195-915(1)(b). Here, because the County complied with this requirement, we conclude that the Board correctly applied RCW 36.70A.172(1).

III. RCW 82.02.020
¶ 33 The Foundation next appears to argue that the County's vegetation regulation is "invalid on its face" because it violates the "constitutional nexus and rough proportionality test" embodied in RCW 82.02.020.[19] Petitioner's Br. at 28-29. We hold that the County has demonstrated that the land dedication requirement of the CMZ regulation is "reasonable necessary" as a direct result of any development within any high-risk CMZ.

A. Standard of Review
¶ 34 The APA standards apply. Thus, we review the Board's order as it applies to the Foundation's argument to determine whether "[t]he order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied" and whether the Board "has erroneously interpreted or applied the law." RCW 34.05.570(3)(a), (d). We review questions of statutory construction under the APA's error of law standard. RCW 34.05.570(3)(d); Postema, 142 Wash.2d at 77, 11 P.3d 726.

B. Board's Treatment of Issue
¶ 35 In its briefs before the Board, the Foundation did not cite RCW 82.02.020, but did briefly discuss the "constitutional nexus and rough proportionality requirements" in its prehearing brief in the context of another argument not raised on appeal. Additionally, in its prehearing brief, the Foundation specifically tied its "constitutional nexus and rough proportionality" argument to the GMA's "best available science" provision. Because the Board interpreted the Foundation's nexus and rough proportionality arguments as constitutional claims, it declined to address them. See RCW 36.70A.280(1) (limiting the Board's jurisdiction to specific matters). The Board did not address RCW 82.02.020 because the Foundation did not cite or discuss it.

C. Failure to Show a Violation of RCW 82.02.020[20]
¶ 36 The Foundation argues that the vegetation regulation violates RCW 82.02.020. We assume without deciding that the issues are properly before us[21] and hold that the CMZ regulation does not violate RCW 82.02.020.
*1052 ¶ 37 RCW 82.02.020 directs that generally, "no county, city, town, or other municipal corporation shall impose any tax, fee, or charge, either direct or indirect, on the. . . development . . . of land." See also Citizens' Alliance for Property Rights v. Sims, 145 Wash.App. 649, 656, 187 P.3d 786 (2008), review denied, 165 Wash.2d 1030, 203 P.3d 378 (2009). RCW 82.02.020 applies to development conditions adopted pursuant to the GMA. Citizens' Alliance, 145 Wash. App. at 663, 187 P.3d 786. It does not, however, preclude dedications of land or easements within the proposed development or plat which the county, city, town, or other municipal corporation can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply. RCW 82.02.020. In other words, it requires that development conditions be tied to a specific, identified impact of a development on a community. Citizens' Alliance, 145 Wash.App. at 665, 187 P.3d 786. RCW 82.02.020 requires both a nexus and rough proportionality[22] for a dedication of land to meet the requirements of RCW 82.02.020. Citizens' Alliance, 145 Wash. App. at 669-70, 187 P.3d 786; see also City of Federal Way v. Town & Country Real Estate, LLC, 161 Wash.App. 17, 45, 252 P.3d 382 (2011) ("RCW 82.02.020 contains the same kind of `rough proportionality' analysis embodied in the Nollan/Dolan standard.").
¶ 38 The Foundation contends that the CMZ regulation is invalid on its face because the County cannot meet the nexus and proportionality test. Petitioner Br. at 29. The Foundation relies on Isla Verde International Holdings, Inc. v. City of Camas, 146 Wash.2d 740, 49 P.3d 867 (2002) and Citizens' Alliance, 145 Wash.App. 649, 187 P.3d 786, for this contention. Those cases are distinguishable.
¶ 39 In Isla Verde, a developer sought review under the Land Use Petition Act (LUPA) of certain conditions placed on the approval of a preliminary plat for a proposed subdivision in the City of Camas. 146 Wash.2d at 745-46, 49 P.3d 867. The challenged conditions included a 30 percent "open space" set aside. Isla Verde, 146 Wash.2d at 745, 49 P.3d 867. The trial court held that the open space set aside violated RCW 82.02.020 because the City made no individualized determination that the 30 percent set aside requirement was necessary to mitigate an impact of the development, the condition was disproportionate to the impact caused by the subdivision, and the City had not established a need for additional open space within the city limits as a result of the proposed development. Isla Verde, 146 Wash.2d at 755, 49 P.3d 867. The Supreme *1053 Court affirmed. Isla Verde, 146 Wash.2d at 765, 49 P.3d 867.
¶ 40 In Citizens' Alliance, the King County ordinance at issue limited the amount of space to be cleared on each lot according to the size of the lot. 145 Wash.App. at 654, 187 P.3d 786. The amount of land to be reserved had no relation to the impacts of the proposed development. Citizens' Alliance, 145 Wash.App. at 668, 187 P.3d 786. For that reason, the ordinance constituted an unlawful in-kind tax. Citizens' Alliance, 145 Wash.App. at 672, 187 P.3d 786.
¶ 41 In contrast, in Trimen Development Co. v. King County, 124 Wash.2d 261, 275, 877 P.2d 187 (1994), our supreme court held that a King County ordinance requiring dedication of open recreational space, or payment of a fee in lieu thereof, for final approval of proposed subdivisions was lawful under RCW 82.02.020 because it determined the amount of land to be dedicated (or fee) based on King County's comprehensive assessment of its park needs and on its annual growth report.
¶ 42 This case is distinguishable from Isla Verde and Citizens' Alliance. In those cases, the ordinances required all property owners to set aside a portion of their land as open space, whether or not the land in question contained critical areas. See Isla Verde, 146 Wash.2d at 746-47, 49 P.3d 867; Citizens' Alliance, 145 Wash.App. at 668, 187 P.3d 786. Here, the County has only prohibited vegetation removal and development within those areas that have determined to be "high risk" critical areas. As a result, any dedications of land within the critical areas are de facto "reasonably necessary as a direct result of the proposed development or plat." RCW 82.02.020. In fact, as discussed above, the County put forth the "best available science" as required by RCW 36.70A.172(1) to show that the CMZ regulation is necessary where applied. Where "best available science" provides a scientific basis for restricting development and disturbance within a critical area, the science ensures that the nexus and proportionality tests are met. See, e.g., HEAL, 96 Wash. App. at 533, 979 P.2d 864 ("[T]he policies and regulations adopted under GMA must comply with the nexus and rough proportionality limits the United States Supreme Court has placed on governmental authority to impose conditions on development applications." (Footnotes omitted.)). As the Board stated, the vegetation at issue has a "significant role in erosion control, bank stabilization, bank protection, and bank accretion." 1 AR at 825. No property owner is required to provide the public with a benefit not immediately related to ensuring the continued function of that vegetation. The Foundation's challenge to the CMZ regulation based on RCW 82.02.020 fails.

IV. NONCONFORMING USE REGULATION
¶ 43 Finally, the Foundation challenges the legality of the County's nonconforming use regulation, JCC 18.22.080, which the County adopted as part of the 2008 critical areas ordinance. The Foundation asserts that JCC 18.22.080 fails to comply with the legislature's 2010 retroactive amendment to RCW 36.70A.480, a GMA provision that relates to shorelines. See LAWS OF 2010, ch. 107, § 1(4), § 2.
¶ 44 RCW 34.05.554(1)(d)[23] permits a party to raise a new issue on appeal if "The interests of justice would be served by resolution of an issue arising from . . . (i) A change in controlling law occurring after the agency action." The remedy is to remand to the agency for determination. RCW 34.05.554(2).
*1054 ¶ 45 Here, justice does not require consideration of the Foundation's argument based on the amendment to RCW 36.70A.480. The administrative record has not been developed as to this issue. A published decision from this court already exists clarifying the impact of the amendment on the law, although it does not address the specific issue raised by the Foundation. See Kitsap Alliance of Property Owners v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 160 Wash.App. 250, 255 P.3d 696, review denied, 171 Wash.2d 1030, 257 P.3d 662 (2011), petition for cert. filed, No. 11-457 (U.S. Oct. 10, 2011). The Foundation asserts no reason why it would be unjust to require it to initiate a new administrative proceeding to consider this question.[24] We decline to remand this case to the Board for further consideration.
¶ 46 We affirm the Board's final decision and order and its subsequent compliance order.
We concur: ARMSTRONG and QUINN-BRINTNALL, JJ.
NOTES
[1] A CMZ is a "corridor of variable width that includes the current river channel plus the adjacent area through which the channel has migrated or is likely to migrate within a given timeframe." 1 Administrative Record (XX-X-XXXXX-X) at 208.
[2] For ease of future reference, we cite to current GMA statutes throughout this opinion. We note that although the legislature amended some of these statutes during the 2008-2011 period, none of these amendments altered the substance of these statutes in a manner that impacts our analysis.
[3] Dave Christensen is a former manager of the County's Natural Resources Division.
[4] For ease of reference, we refer to the Foundation and the seven members as "the Foundation."
[5] RCW 36.70A.370(1) orders the state attorney general to establish an "orderly, consistent process" to evaluate proposed regulatory or administrative actions to assure that such actions do not result in an unconstitutional taking of private property. Local governments must abide by this process. RCW 36.70A.370(2).
[6] 1 AR is the administrative record pertaining to superior court cause number XX-X-XXXXX-X and 2 AR is the administrative record pertaining to superior court cause number XX-X-XXXXX-X.
[7] Citing Ecology's publication 03-06-027, which discusses the importance of riparian vegetation in providing habitat and limiting erosion.
[8] Citing chapters 4 and 5 of the Perkins Geosciences's "Lower Hoh River Channel Migration Study," which address, respectively, "Channel Migration" and "Forest Cover, Large Woody Debris, and Channel Morphology."
[9] The nonconforming use regulation reads in its entirety:

(1) Any legal use or legal structure in existence on the effective date of [this Chapter 18.22] that does not meet the buffer requirements of this chapter for any designated critical area shall be considered a legal nonconforming use.
(2) Any use or structure for which an application has vested or for which a permit has been obtained prior to the effective date of the ordinance codified in this chapter, that does not meet the buffer requirements of this chapter for any designated critical area, shall be considered a legal nonconforming use.
(3) A legal nonconforming use or structure may be maintained or repaired without limitation by this chapter.
(4) A legal nonconforming use or structure that has been damaged or destroyed by fire or other calamity may be restored and its immediately previous use may be resumed.
JCC 18.22.080.
[10] JCC 18.10.030's current classification scheme is as follows:

-----------------------------------------------------------------------------------------
 Type of CMZ Timeframe of Likely Rivers Affected
 Channel Migration
-----------------------------------------------------------------------------------------
 High risk Within 50 years Big Quilcene, Little Quilcene,
 Dosewallips, Duckabush, Lower Hoh
-----------------------------------------------------------------------------------------
 Moderately high risk Within 50 to 100 years Lower Hoh
-----------------------------------------------------------------------------------------
 Moderate risk Within 50 to 100 years Big Quilcene, Little Quilcene,
 Dosewallips, Duckabush
-----------------------------------------------------------------------------------------
 Moderate hazard Beyond 100 yards Lower Hoh
-----------------------------------------------------------------------------------------
 Low risk Beyond 100 years Big Quilcene, Little Quilcene,
 Dosewallips, Duckabush
-----------------------------------------------------------------------------------------
 Low hazard Not Defined Lower Hoh
-----------------------------------------------------------------------------------------

[11] The Port Gamble S'Klallam Tribe, the Jamestown S'Klallam Tribe, and Futurewise participated below as amici curiae in support of the County. We denied a motion by the tribes and Futurewise to intervene and file an amicus brief in this appeal.
[12] The Foundation does not, for example, assert that the scientific studies in the record suffer from faulty methodologies, insufficient peer review, illogical conclusions, poor quantitative analysis, or other defects that taint the scientific process. See WAC 365-195-905(5)(a) (establishing criteria for determining whether information displays the characteristics of a valid scientific process).
[13] As part of its challenge, the Foundation assigns error to conclusions of law K and M. However, because the Foundation does not argue in its briefing before us, as it did below, that the County cannot designate CMZs as a type of critical area under the GMA, we do not address those portions of conclusions of law K and M related to the designation issue.
[14] The Foundation argues that a de novo standard of review applies to APA challenges under RCW 34.05.570(3)(d). See Petitioner's Br. at 8 (citing City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 45, 959 P.2d 1091 (1998)). But even the case that the Foundation cites to support the de novo standard of review supports deference here. See City of Redmond, 136 Wash.2d at 46, 959 P.2d 1091 ("We accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute.").
[15] The APA directs courts to grant relief from an administrative order when substantial evidence does not support the order. RCW 34.05.570(3)(e).
[16] The court concluded that the information was not "scientific" because (1) nothing in the planner's background suggested that he was familiar with Ferry County wildlife, (2) he cited only two reference sourcesa birding manual and his discussion with the DFW biologist about a single speciesto support his listing recommendation, and (3) he did not employ any other scientific methods, like on-site observations or conferring with local experts. Concerned Friends of Ferry County, 155 Wash.2d at 836-37, 123 P.3d 102. Instead, the information provided by the wildlife planner "resemble[d] nonscientific information. . . more similar to speculation or surmise." Concerned Friends of Ferry County, 155 Wash.2d at 837, 123 P.3d 102.
[17] Until 2009, the Department of Commerce was called the Department of Community, Trade, and Economic Development. See LAWS OF 2009, ch. 565. We use the agency's current name for ease of future reference.
[18] The legislature has provided rulemaking authority to the Department of Commerce to "[a]dopt[ ] by rule procedural criteria to assist counties and cities in adopting comprehensive plans and development regulations that meet the goals and requirements of [the GMA]." RCW 36.70A.190(4)(b). The legislature directed the growth management hearings boards to consider these criteria when determining whether a county has complied with the GMA. RCW 36.70A.320(3).
[19] RCW 82.02.020 generally provides, with some exceptions, that the state preempts the field of imposing certain taxes:

[N]o county . . . shall impose any tax, fee, or charge, either direct or indirect, on the construction or reconstruction of residential buildings, commercial buildings, industrial buildings, or on any other building or building space or appurtenance thereto, or on the development, subdivision, classification, or reclassification of land. However, this section does not preclude dedications of land or easements within the proposed development or plat which the county . . . can demonstrate are reasonably necessary as a direct result of the proposed development or plat to which the dedication of land or easement is to apply.
See also Isla Verde Int'l Holdings, Inc. v. City of Camas, 146 Wash.2d 740, 753, 49 P.3d 867 (2002). We note that the legislature has twice amended the language in the introductory paragraph of RCW 82.02.020 since the BOCC enacted the 2008 ordinance. LAWS OF 2009, ch. 535, § 1103; LAWS OF 2008, ch. 113, § 2. Because these amendments do not affect our analysis, we cite to the current version of the statute for ease of future reference.
[20] In our withdrawn opinion, we held that any challenge raised by the Foundation based on a takings argument under the Fifth Amendment of the United States Construction was not ripe. U.S. CONST. amend. V; see also Chicago, Burlington & Quincy R.R. v. City of Chicago, 166 U.S. 226, 239, 17 S.Ct. 581, 41 L.Ed. 979 (1897) (Fifth Amendment's takings clause applies to the states through the Fourteenth Amendment). Upon reconsideration, we note that no Fifth Amendment takings claim was brought by the Foundation, either at the Board level or here on appeal. It is clear from the briefing on appeal that the Foundation brought only a statutory claim under RCW 82.02.020, similar arguments raised in Citizens' Alliance for Property Rights v. Sims, 145 Wash.App. 649, 187 P.3d 786 (2008), review denied, 165 Wash.2d 1030, 203 P.3d 378 (2009). While that statute incorporates the standard for a Fifth Amendment takings challenge, we decline to address a takings challenge where none was raised by the Foundation.
[21] In our withdrawn opinion, we held that the Foundation had failed to preserve this issue by not raising it at the hearing before the Board. Slip op. at 25. Upon reconsideration, we note that the Board lacks the jurisdictional authority to decide claims alleging a violation of property rights, including a violation of RCW 82.02.020. See, e.g., Citizens for Rational Shoreline Planning v. Whatcom County, No. 08-2-0031, at 8-9 (W. Wash. Growth Mgmt. Hearings Bd. Decision and Order Jan. 16, 2009) (finding Growth Management Hearings Boards do not have jurisdiction to address issues related to chapter 82.02 RCW); Whidbey Envt'l Action Network v. Island County, No. 06-2-0023, at 8 (W. Wash Growth Mgmt. Hearings Bd. Decision and Order Jan. 24, 2007). We also note, however, that no party raised the issue of whether the Foundation's claim regarding RCW 82.02.020 was properly brought in this forum. We question whether the claim is properly raised here. Specifically, we question whether the claim could only be brought as a separate superior court action, whether the claim is ripe where the Foundation has not proposed a specific development, whether the Foundation has standing to assert the claim, and whether a hearing before the Board pursuant to the GMA is the proper forum to raise a challenge under the statute. Because neither party raised these issues, we will resolve this question on the merits. RAP 12.1(a).
[22] The "nexus" and "rough proportionality" tests are also called the "Nollan/Dolan" tests, after the United States Supreme Court's decisions in Nollan v. California Coastal Commission, 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), and Dolan v. City of Tigard, 512 U.S. 374, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). The Nollan majority held that the United States Constitution's Fifth Amendment "takings clause" requires an "essential nexus" between the negative impacts that a private property use generates and the conditions or prohibitions imposed to restrict that use of private property. 483 U.S. at 827, 837, 107 S.Ct. 3141. Seven years later, the United States Supreme Court announced in Dolan that the "takings clause" contains a "rough proportionality" test requiring the government to "make some sort of individualized determination that the required dedication [of private land] is related both in nature and extent to the impact of the proposed development." 512 U.S. at 391, 114 S.Ct. 2309.
[23] RCW 34.05.554 states, in its entirety:

(1) Issues not raised before the agency may not be raised on appeal, except to the extent that:
(a) The person did not know and was under no duty to discover or could not have reasonably discovered facts giving rise to the issue;
(b) The agency action subject to judicial review is a rule and the person has not been a party in adjudicative proceedings that provided an adequate opportunity to raise the issue;
(c) The agency action subject to judicial review is an order and the person was not notified of the adjudicative proceeding in substantial compliance with this chapter; or
(d) The interests of justice would be served by resolution of an issue arising from:
(i) A change in controlling law occurring after the agency action; or
(ii) Agency action occurring after the person exhausted the last feasible opportunity for seeking relief from the agency.
(2) The court shall remand to the agency for determination any issue that is properly raised pursuant to subsection (1) of this section.
[24] Also, as asserted by the County, this issue may not be ripe, as "[t]here is no evidence that Jefferson County is improperly applying nonconforming use regulations to shoreline development." Response to Mot. for Recons. at 10.